## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| LAKES AND PARKS ALLIANCE OF MINNEAPOLIS, | Civil No.  14-3391 (JRT/SER) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON MOTIONS TO DISMISS** |
| FEDERAL TRANSIT ADMINISTRATION, and THE METROPOLITAN COUNCIL, | |
| Defendants. | |

Lewis A. Remele, Jr., and J. Scott Andresen, **BASSFORD REMELE, P.A.**, 33 South Sixth Street, Suite 3800, Minneapolis, MN  55402; and Thomas L. Johnson and Joy Reopelle Anderson, **GRAY PLANT MOOTY MOOTY & BENNETT, P.A.**, 80 South Eighth Street, Suite 500, Minneapolis, MN  55402, for plaintiff.

Craig R. Baune, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN  55415, for defendant Federal Transit Administration.

Charles N. Nauen, David J. Zoll, and Kristen G. Marttila, **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN  55401; and Ann K. Bloodhart, **METROPOLITAN COUNCIL: OFFICE OF GENERAL COUNSEL**, 390 Robert Street North, St. Paul, MN 55101;  for defendant Metropolitan Council.

Plaintiff Lakes and Parks Alliance of Minneapolis ("LPA") brings this action against defendants Federal Transit Administration ("FTA") and Metropolitan Council ("Met Council").  The Met Council is a Minnesota transportation planning organization, tasked with planning, constructing, and operating a future light rail transit route – the

Southwest Light Rail Transit project ("SWLRT") – that would connect downtown Minneapolis to the southwestern Twin Cities. Although the Met Council and FTA are in the midst of the environmental planning process under the National Environmental Policy Act ("NEPA"), the Met Council has also engaged in the municipal consent process, under state law, with communities along the proposed light rail route.

The LPA brings this action, alleging that by obtaining municipal consent with so much of the NEPA approval process still ahead, the FTA and Met Council are violating NEPA. The LPA also alleges that the Met Council is violating the Minnesota Environmental Policy Act ("MEPA"), along with the state's laws governing municipal consent of light rail projects. Because sovereign immunity bars the LPA's claim against the federal government, the Court will grant the FTA's motion to dismiss. The Court concludes the LPA has no implied cause of action under MEPA and will grant the Met Council's motion to dismiss as to that claim. However, the Court concludes a cause of action exists under NEPA and the light rail municipal consent statutes and will deny the Met Council's motion to dismiss as to those claims.

## BACKGROUND

### I.    OVERVIEW OF PARTIES AND COMPLAINT

The LPA is a Minnesota non-profit corporation. (Am. Compl. ¶ 4, Nov. 3, 2014, Docket No. 12.) Individual members of the LPA live or work near and/or frequently use and enjoy the environmental resources in the Kenilworth Corridor area in Minneapolis. (*Id.*)

The FTA is an agency within the U.S. Department of Transportation that provides financial and technical assistance to local public transit systems.  (*Id.* ¶ 5.)  The FTA is the lead federal agency for the SWLRT.  (*Id.*)  The Met Council is the regional policy-making body, planning agency, and transit services provider for the Twin Cities metropolitan region.  (*Id.* ¶ 6.)  The Met Council is the responsible governmental unit for the environmental review of the SWLRT, and the entity responsible for planning, designing, acquiring, constructing, and equipping the SWLRT.  (*Id.*)

The LPA is seeking declaratory and injunctive relief pursuant to the National Environmental Policy Act ("NEPA"), the Minnesota Environmental Policy Act ("MEPA"), and Minnesota Statute § 473.3993 *et seq.* ("Minnesota Light Rail Transit Statutes" or, when referring to the provisions that govern municipal consent, the "municipal consent statutes").  (*Id.* ¶ 1.)  In Count I, the LPA alleges that the defendants violated NEPA by moving forward with the municipal consent process on the SWLRT before the completion of a full environmental review.  (*Id.* ¶¶ 42-52.)  In Counts II and III, the LPA alleges that by undertaking a premature municipal consent process, the Met Council also violated MEPA and Minnesota Statute § 473.3994 ("Municipal Consent Statute" in the Minnesota Light Rail Transit Statutes).  (*Id.* ¶¶ 53-69.)

## II.     THE SOUTHWEST LIGHT RAIL TRANSIT PROJECT

The SWLRT is a proposed light rail line that would run from downtown Minneapolis through the communities of St. Louis Park, Hopkins, Minnetonka, and Eden Prairie.  (*Id.* ¶ 12.)  Funding for the SWLRT is provided by the FTA, the state of

Minnesota, the Counties Transit Improvement Board, and the Hennepin County Regional Railroad Authority ("HCRRA").  (*Id.* ¶ 13.)

The current plans call for the SWLRT to pass through the Kenilworth Corridor. (*Id.* ¶ 14.)  The corridor is an allegedly environmentally sensitive area approximately one and one-half miles in length between Cedar Lake and Lake of the Isles in Minneapolis. (*Id.*)  The corridor contains a popular bicycle and pedestrian trail, along with existing freight rail tracks.  (*Id.*)  Under the current plans, SWLRT trains would pass through the southern half of the Kenilworth Corridor in two tunnels, then emerge from the ground to pass over the channel connecting Cedar Lake and Lake of the Isles ("Kenilworth Channel") on a new bridge before continuing through the northern portion of the corridor above ground.[1]  (*Id.* ¶ 15.)  The freight rail tracks would remain in the corridor and would pass over the channel on a separate new bridge.  (*Id.*)

The FTA has provided financial assistance to the Met Council related to the SWLRT.  (Decl. of Sheila Clements ("Clements Decl.") ¶ 3, Nov. 17, 2014, Docket No. 34.)  Specifically, the SWLRT project has received one grant from FTA in the amount of $534,375 for Alternative Analysis.  (*Id.*)  FTA has not awarded any other grants for the SWLRT project.  (*Id.*)

---

[1] This plan to route SWLRT trains through a tunnel in the southern portion of the corridor, but above ground in the northern portion ("South Tunnel Deal" or "South Tunnel Plan"), was a compromise route reached during the municipal consent process during the summer of 2014.  (Am. Compl. ¶¶ 35-36.)

## III.    ENVIRONMENTAL REVIEW PROCESS FOR THE SWLRT

NEPA requires federal agencies to consider the environmental impacts and prepare an Environmental Impact Statement ("EIS") for all ""major Federal actions significantly affecting the quality of the human environment.'" *Sierra Club v. U.S. Forest Serv.*, 46 F.3d 835, 837 (8th Cir. 1995) (quoting 42 U.S.C. § 4332(2)(C)). The parties do not dispute that the SWLRT is a major governmental action that requires preparation of an EIS pursuant to NEPA. (*See* Def. FTA's Mem. in Support of its Mot. to Dismiss ("FTA Mem.") at 5, Nov. 17, 2014, Docket No. 32.)

### A.    The Scoping Process for the SWLRT Project

The first step in preparation for an EIS is the Scoping Process. 40 C.F.R. § 1501.7. A Scoping Process for the SWLRT project was performed in the fall of 2008 by the HCRRA, which was responsible for conducting the first portion of the environmental review. (Am. Comp. ¶ 23.) The results of the Scoping Process were included in a Scoping Summary Report dated January 2009. (*Id.*) The Scoping Summary Report set forth the alternatives to be studied and analyzed in the draft EIS ("DEIS"). (*Id.* ¶ 24.) None of the alternatives proposed for study at that time included the construction of any tunnels in the Kenilworth Corridor. (*Id.*) The HCRRA unanimously voted to accept the SWLRT Scoping Summary Report on January 27, 2009 as its Scoping Decision. (*Id.*)

## B.      The Draft Environmental Impact Statement

The next step in the environmental review process is the DEIS.    40 C.F.R. § 1502.9(a).    Federal regulations dictate that a DEIS must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a).

In October 2012, a DEIS was drafted and released to the public.  (Am. Compl. ¶ 25.)  Written comments on the DEIS were accepted from October through December of 2012.  (Decl. of Maya Sarna ("Sarna Decl.") ¶ 5, Nov. 17, 2014, Docket No. 33.)  Nearly 1,000 public comments were received during the public review and comment period following the release of the DEIS.  (Am. Compl. ¶ 25.)

The DEIS considered seven alternatives for the SWLRT[2], which included three strategies for dealing with the Kenilworth Corridor.  (*Id.* ¶ 26.)  The three strategies included:

> (1) rerouting the existing freight rail traffic through the City of St. Louis Park to provide adequate room for the SWLRT in the Kenilworth Corridor; (2) rerouting the existing freight rail through the City of St. Louis park and running the SWLRT through the Midtown Corridor instead of the Kenilworth Corridor; or (3) co-locating the SWLRT, freight rail, and bicycle/pedestrian trail at-grade through the entire Kenilworth Corridor.

---

[2] The seven alternatives included: "a No Build alternative; an Enhanced Bus alternative; two alternatives re-locating the existing freight rail service to the MN&S line in St. Louis Park and running the SWLRT through the Midtown Corridor []; two alternatives re-locating the existing freight rail service to the MN&S line in St. Louis Park with the SWLRT running at-grade through the Kenilworth Corridor []; and, lastly, an alternative having the existing freight rail service and the SWLRT co-located at-grade through the Kenilworth Corridor []."  (Am. Compl. ¶ 26 n. 2.)

(*Id.* ¶ 26.)   None of the alternatives provided for the construction of tunnels in the Kenilworth Corridor. (*Id.*)

The co-location alternative was the only alternative that did not require re-routing freight rail traffic through St. Louis Park.  Under the other alternatives, freight rail traffic would have been rerouted through St. Louis Park to make room for the SWLRT.  (*Id.* ¶ 26.)  Many St. Louis Park residents expressed their concerns with such rerouting.  (*Id.* ¶ 30.)

However, the 2012 DEIS concluded that the co-location alternative would not adequately preserve the environment and protect the quality of life in the area.  (*Id.* ¶ 31.) Despite the DEIS's preference for re-directing freight rail through St. Louis Park, after the DEIS was completed, the U.S. Army Corps of Engineers performed additional analysis and the FTA determined that re-locating the freight rail line was not feasible and including a tunnel for the light rail tracks in the Kenilworth Corridor might alleviate some of the environmental concerns associated with the co-location alternative.  (Sarna Decl. ¶ 9.)

After completion of the DEIS, responsibility for the environmental review process under MEPA, including the completion of the Final Environmental Impact Statement ("FEIS"), was transferred from the HCRRA to the Met Council.  (Am. Comp. ¶ 27.)  In July 2013, the Met Council and the FTA gave notice that they intended to publish a Supplemental DEIS ("SDEIS"), which would evaluate potential environmental impacts resulting from changes in the proposed design that were not documented in the DEIS.

(*Id.* ¶ 28; Sarna Decl. ¶ 9.)  The notice stated that the scope of the SDEIS would include, but was not limited to, the following areas: Eden Prairie LRT alignment and stations; the location of the LRT operations and maintenance facility; freight rail alignments; and other areas where the FTA and the Metropolitan Council determined additional information was needed.  (Am. Compl. ¶ 28.)  The SDEIS will also be available for public comment.  (Sarna Decl. ¶ 10.)

In early 2014, new options were discussed, including moving the SWLRT into shallow or deep tunnels through the Kenilworth Corridor while keeping the freight rail tracks and bicycle/pedestrian trails on the surface.  (*Id.* ¶ 32.)  In April 2014, the Met Council approved as the "locally preferred alternative" a plan that routed the SWLRT through the Kenilworth Corridor in two shallow tunnels, with trains emerging from the tunnels to pass over the channel between Cedar Lake and Lake of the Isles ("Tunnel Plan").  (*Id.* ¶ 33.)  This was the first time that the Tunnel Plan had been mentioned, as it was not included in the Scoping Summary Report or DEIS.  (*Id.*)  To date, the FTA has not made its NEPA determination regarding the SWLRT.  (Sarna Decl. ¶ 11.)

## IV.    THE MUNICIPAL CONSENT PROCESS

After the selection of the Tunnel Plan, the Met Council commenced the municipal consent process.  (Am. Compl. ¶ 34.)  "Municipal consent" is required for light rail transit projects by Minnesota Statute § 473.3994, which states that each city and county in which a light rail transit route is proposed to be located must hold a public hearing and

vote to approve or disapprove the physical design component of the preliminary design plans for the project.  Minn. Stat. § 473.3994, subds. 2-3.

In late April 2014, the Met Council submitted the Tunnel Plan to Hennepin County and to the cities of Minneapolis, St. Louis Park, Hopkins, Minnetonka, and Eden Prairie for public hearings and approval.  (Am. Compl. ¶¶ 33-34.)  The City of Minneapolis and the Met Council entered into negotiations regarding potential changes to the project.  (*Id.* ¶ 35.)  In July 2014, the City of Minneapolis and the Met Council announced an agreement under which the tunnel to the south of the Kenilworth Channel would remain in the plans, but the tunnel north of the Channel would be eliminated ("South Tunnel Deal" or "South Tunnel Plan").  (*Id.*)  Under the South Tunnel Plan, the SWLRT, freight rail service, and the bicycle/pedestrian trail would all be co-located, at-grade, north of the Kenilworth Channel.  (*Id.*)  Essentially, the South Tunnel Plan includes parts of the co-location alternative, which was rejected by the 2012 DEIS.  (*Id.* ¶ 31.)

The City of Minneapolis held a public hearing on the proposed South Tunnel plan on August 19, 2014.  (*Id.* ¶ 36.)  No DEIS analyzing the proposed project was available for public review before or after the hearing.  (*Id.*)

By August 29, 2014, all six local governments had approved the proposed SWLRT plan, with the City of Minneapolis approving the South Tunnel Plan modification.  (*Id.* ¶ 37)  The City of St. Louis Park approved the SWLRT plan, but also signed a Memorandum of Understanding ("MOU"), which stated that "no further study of the feasibility of rerouting freight traffic to the MN&S Route in St. Louis Park will be

undertaken, except as required for any continuing environmental review of the SWLRT project." (*Id.* ¶ 37.)

## V.      LPA'S LETTER TO THE FTA AND METROPOLITAN COUNCIL

In July 2014, the LPA wrote to the FTA to inform the FTA that the SWLRT environmental review process did not meet the requirements of federal and state law. (*Id.* ¶ 40.) The letter, a copy of which was sent to the Met Council, asked the FTA to refuse to provide further federal funding for the SWLRT project unless and until the Met Council appropriately supplemented the environmental review. (*Id.*) The FTA replied to the LPA by stating that it monitors all federally assisted projects for NEPA compliance and that no cessation of funding was warranted for the SWLRT project. (*Id.*)

## VI.     THE REMAINING STEPS IN THE ENVIRONMENTAL REVIEW PROCESS AND STATUS OF THE SWLRT

The Met Council is currently working on the SDEIS, which is scheduled to be completed in early 2015.[3]   (*Id.* ¶ 38.)   The SDEIS will analyze additional potential

---

[3] News reports reveal that the SDEIS will likely be moved back until later in 2015. *See* Eric Roper, *New delays for Southwest LRT timeline with Met Council parkland analysis*, Star Tribune (Feb. 11, 2015), http://www.startribune.com/local/west/290986001.html; Peter Callaghan, *Park Board gets feds to order more extensive environmental review of Southwest LRT*, MinnPost (Feb. 5, 2015), https://www.minnpost.com/politics-policy/2015/02/park-board-gets-feds-order-more-extensive-environmental-review-southwest-lrt. In light of requests from the Minneapolis Park Board, the FTA has requested that the Met Council conduct further analysis – earlier in the process – of the SWLRT's impact on parks in the Kenilworth Corridor area. Callaghan, *supra*. That analysis will precede the completion of the SDEIS.

Even more recent reports indicate that while this study will take place, the Met Council has signed a memorandum of understanding with the Minneapolis Park Board and the board has decided to drop its opposition for building bridges over the Kenilworth Channel. *See* Peter

(Footnote continued on next page.)

impacts caused by the SWLRT and possible actions to reduce or mitigate these impacts. After public input on the SDEIS has been received and further environmental analysis has been performed, the Met Council will complete and release a final EIS ("FEIS"). (*Id.* ¶ 39.) The FEIS will be completed later in 2015 or 2016. (*Id.*) After the completion of the FEIS, the FTA will then issue a Record of Decision ("ROD") that provides environmental clearance. (*Id.*); *see also* 40 C.F.R. § 1505.2. The Met Council's current project timeline indicates that it expects an ROD in 2016.[4] Heavy construction would occur between 2017 and 2018.[5] SWLRT passenger service is projected to begin in 2019.[6]

## VII. THIS LITIGATION

The LPA filed this lawsuit on September 8, 2014 and filed an amended complaint on November 3, 2014. (Am. Compl.) The LPA filed a motion for summary judgment on the same date. (Mot. for Summ. J., Nov. 3, 2014, Docket No. 13.) Both the FTA and Met Council moved to dismiss the LPA's action. (Def. FTA's Mot. to Dismiss ("FTA

---

(Footnote continued.)

Callaghan, *Minneapolis Park Board relents in battle with Met Council; drops objection to Kenilworth Channel bridges*, MinnPost (Feb. 27, 2015), http://www.minnpost.com/politics-policy/2015/02/minneapolis-park-board-relents-battle-met-council-drops-objection-kenilworth.

[4] *See Project Timeline*, Metropolitan Council, http://www.metrocouncil.org/Transportation/Projects/Current-Projects/Southwest-LRT/Project-Facts/Timeline.aspx (last visited Feb. 25, 2015).

[5] *Id.*

[6] *Id.*

Mot. to Dismiss"), Nov. 17, 2014, Docket No. 30; Mot. by Def. Met Council to Dismiss Pl.'s Am. Compl., Nov. 17, 2014, Docket No. 36.)

The LPA seeks declaratory and injunctive relief pursuant to NEPA, MEPA, and the Minnesota Light Rail Transit statutes.   (Am. Compl. ¶ 1.)  In Count I, the LPA alleges that the defendants violated NEPA by moving forward with the municipal consent process on the SWLRT before the completion of a full environmental review.  (*Id.* ¶¶ 42-52.)  Specifically, the LPA argues that the municipal consent process has violated the requirement in 40 C.F.R. § 1506.1, which states that until a final record of decision has been issued as to a project, "no action concerning the proposal shall be taken which would . . . [l]imit the choice of reasonable alternatives."  40 C.F.R. § 1506.1.  The Met Council has allegedly violated the regulation by initiating the municipal consent process, negotiating compromises with certain cities, and effectively selecting a specific route and design.  (Am. Compl. ¶ 47.)  The FTA has violated the regulation because, despite being warned by the LPA of the Met Council's actions during the municipal consent process, the FTA has failed to notify the Met Council of its violation of the regulation, in accordance with 40 C.F.R. § 1506.1(b).  (*Id.* ¶ 48.)

In Counts II and III, the LPA alleges that by undertaking a premature municipal consent process, the Met Council also violated MEPA and Minnesota Statute § 473.3994. (*Id.* ¶¶ 53-69.)  Specifically, as to Count II, the LPA alleges that the Met Council's actions – discussed above in Count I – violate MEPA regulations that bar a governmental unit like the Met Council from taking "any action with respect to the project . . . if the action will prejudice the ultimate decision on the project, until . . . the final EIS has been

- 12 -

determined adequate by" the responsible governmental unit.   Minn. R. 4410.3100, subp. 2; (Am. Compl. ¶¶ 57-58.)  As to Count III, the LPA alleges that the Met Council's actions violated Minnesota Statute § 473.3994, subd. 3, which governs the municipal consent process and requires that the local governments voting on a project have available "the physical design component of the preliminary design plans" for the project. The preliminary design plan includes "the preliminary or draft environmental impact statement for the light rail transit facilities proposed."  Minn. Stat. § 473.3993, subd. 2. Since the existing DEIS does not discuss the South Tunnel Plan agreed to by the relevant municipalities, the LPA argues the Met Council violated this statute by obtaining their approval without giving them a DEIS regarding the route they approved.  (Am. Compl. ¶¶ 64-66.)

## ANALYSIS

### I.    STANDARD OF REVIEW

#### A.    Motion to Dismiss for Lack of Jurisdiction over the Subject Matter.

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction and requires the Court to examine whether it has authority to decide the claims.  *Uland v. City of Winsted*, 570 F. Supp. 2d 1114, 1117 (D. Minn. 2008).  It is the plaintiff's burden to establish that jurisdiction exists.  *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990).  In deciding a motion to dismiss for lack of subject matter jurisdiction, the Court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Id.* (quotation marks

omitted).  If the Court finds that jurisdiction is not present, it must dismiss the matter. Fed. R. Civ. P. 12(h)(3); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583–84 (1999).

### B.     Motion to Dismiss for Failure to State a Claim.

In reviewing a motion to dismiss brought under Rule 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states "'a claim to relief that is plausible on its face.'"  *See Magee v. Trs. of Hamline Univ., Minn.*, 747 F.3d 532, 535 (8th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility" and therefore must be dismissed.  *Id.* (internal quotation marks omitted).  Although the Court accepts the complaint's factual allegations as true, it is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Therefore, to survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## II.     FTA'S MOTION TO DISMISS

### A.     Federal Transit Act and NEPA

The FTA is a grant-making agency within the Department of Transportation. Chapter 53 of Title 49 of the United States Code authorizes the Secretary of Transportation to make grants or loans supporting states and local agencies in the planning, development, and improvement of mass transportation facilities. *See, e.g.*, 49 U.S.C. §§ 5307 and 5309. The FTA provides federal financing to local transit systems, such as the Met Council in this case, which are entrusted with making decisions on the details of projects that receive federal funding under Chapter 53. In particular, the Met Council is seeking funds for the SWLRT through the FTA's "New Starts" program.[7] Under the New Starts program, prospective recipients submit applications for funding of eligible projects.[8]  *See generally HonoluluTraffic.com v. FTA*, No. 11-307, 2012 WL 5386595, at *2 (D. Haw. Nov. 1, 2012) (discussing a Hawaii transit project that was to be funded through local tax revenue and the New Starts program authorized in 49 U.S.C. § 5309). Prior to approving a grant, the FTA ensures that various statutory and regulatory prerequisites, including NEPA, are met.[9]

---

[7]  *Project Funding*, Met Council, http://metrocouncil.org/Transportation/Projects/Current-Projects/Southwest-LRT/Grants-Funding-(SWLRT).aspx (last visited Mar. 3, 2015).

[8]  *Capital Investment Program: New Starts, Small Starts and Core Capacity Improvements*, Federal Transit Administration, http://www.fta.dot.gov/12304.html (last visited Mar. 3, 2015).

[9] *Id.*

As noted above, NEPA requires federal agencies to consider the environmental impacts and prepare an EIS for all "'major federal actions significantly affecting the quality of the human environment.'" *Sierra Club v. U.S. Forest Serv.*, 46 F.3d at 837 (quoting 42 U.S.C. § 4332(2)(C)).   Once an agency has prepared an EIS, further analysis is required only if the agency makes substantial changes relevant to environmental concerns or if significant new information arises that will affect the quality of the environment "in a significant manner or to a significant extent not already considered." *Marsh v. Or. Nat'l Res. Council*, 490 U.S. 360, 374 (1989); *see Arkansas Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1104 (8th Cir. 2005) ("An agency does not have to provide a [Supplemental EIS] every time new information comes to light; 'to require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made.'" (quoting *Marsh*, 490 U.S. at 374)).   In this case, the Met Council is already preparing a supplemental EIS, in order to assess the South Tunnel Plan.

NEPA serves the dual purposes of informing agency decision-makers of the environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).   NEPA's mandate to the agencies is "essentially procedural." *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978).   "Other statutes may impose substantive environmental obligations on federal

agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action." *Robertson*, 490 U.S. at 351.

NEPA does not authorize a private right of action, but judicial review is authorized by the Administrative Procedure Act ("APA"). *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006). When the merits of a NEPA decision are properly challenged, "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999) (internal quotation marks omitted). The Court cannot substitute its judgment for that of the agency, nor should it "'fly speck' an EIS for inconsequential or technical deficiencies." *Id.*

### B.     Sovereign Immunity

The FTA argues that federal sovereign immunity bars the LPA's claim, along with the related argument that the LPA has no cause of action against the FTA under NEPA. Absent an express waiver by the government, sovereign immunity protects the United States and its agents from suit. *United States v. Shaw*, 309 U.S. 495, 500-01 (1940); *United States v. Kearns*, 177 F.3d 706, 709 (8th Cir. 1999). A district court lacks jurisdiction to hear a case against the United States or its agents unless sovereign immunity has been expressly waived. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the federal government and its agencies from suit."); *Kearns*, 177 F.3d at 709 (same). The APA is widely accepted as the only

waiver of sovereign immunity for NEPA claims.  *Cf. Lujan v. Nat'l Wildlife Fed'n*, 497

U.S. 871, 882-83 (1990); *Utah Envlt. Cong. v. Richmond*, 483 F.3d 1127, 1134 (10th Cir.

2007); *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d at 813.

The LPA, however, concedes that the FTA has not rendered any final action in this

case and has expressly chosen not to bring an APA claim.  Instead, the LPA argues that a

NEPA **regulation**, 40 C.F.R. § 1500.3, provides a waiver of sovereign immunity and a

cause of action to enforce the requirements of Section 1506.1.  Section 1500.3 states:

> It is the Council's[10] intention that judicial review of agency compliance
> with these regulations not occur before an agency has filed the final
> environmental impact statement, or has made a final finding of no
> significant impact ["FONSI"] (when such a finding will result in action
> affecting the environment), or takes action that will result in irreparable
> injury.  Furthermore, it is the Council's intention that any trivial violation
> of these regulations not give rise to any independent cause of action.

40 C.F.R. § 1500.3.   However, the Court can find no authority that supports the

proposition that Section 1500.3 provides for judicial review where sovereign immunity

would otherwise bar it.   Indeed, the LPA's argument is so contrary to the axiomatic

doctrine that only the APA allows for a court to review an agency's actions under NEPA,

that few cases have considered the issue at all.  *Cf. Prairie Band Pottawatomie Nation v.*

*Fed. Highway Admin.*, 751 F. Supp. 2d 1174, 1194-95 (D. Kan. 2010) (citing Section

1500.3 throughout the opinion as guidance on how courts should analyze agency

compliance with NEPA, but also stating that "[b]ecause NEPA does not provide an

independent cause of action, the Court reviews the FEIS as a final agency action under

---

[10] "Council" refers to the Council on Environmental Quality ("CEQ") established by
NEPA, which issued the NEPA regulations.

the APA"); *Cent. Delta Water Agency v. U.S. Fish & Wildlife Serv.*, 653 F. Supp. 2d 1066, 1093 (E.D. Cal. 2009) (concluding, pursuant to the APA, that a challenge to a proposed action was not ripe where no EIS had yet been prepared, and citing to and quoting the language above from Section 1500.3).   Moreover, irrespective of whether there is case law on point, a thorough analysis of Section 1500.3 reveals that it does not waive the federal government's sovereign immunity.

First, the language of Section 1500.3 does not provide the required express waiver of immunity.  It does not contain the explicit language establishing a cause of action, and thereby waiving sovereign immunity, that is found in other statutes.  *See, e.g.*, 33 U.S.C. § 1365(a)(1).  It is true that one possible reading of the statute is that Section 1500.3 attempts to impose judicial review on agencies.  But given that the APA already contains a waiver of immunity that is relevant to NEPA claims, *Lujan*, 497 U.S. at 882-83, and that the relevant APA text closely tracks the judicial review language in Section 1500.3, 5 U.S.C. §§ 704-05, the more reasonable interpretation is that Section 1500.3 simply outlines the Council's expectations for actions under the pre-existing vehicle for review: the APA.  To the extent there is an ambiguity in the regulation's text, courts must construe ambiguities in favor of immunity.  *Lane v. Pena*, 518 U.S. 187, 192 (1996) ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied.   Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." (citations omitted)).   Consequently, the ambiguity in Section

1500.3 suggests that the Court should err against reading it as a waiver of sovereign immunity.

The LPA cites two cases to support its Section 1500.3 sovereign immunity argument.  However, the cited cases detract from, rather than help, the LPA's case.  In *Ro Ane*, the court held that language in the Social Security Act, stating that "**[a]ny individual** after any final decision of the Secretary . . . **may obtain a review** of such decision . . . **in the district court** of the United States . . .," creates a waiver of sovereign immunity.  *Ro Ane v. Mathews*, 476 F. Supp. 1089, 1092-93 & n.4 (N.D. Cal. 1977) (emphasis added).  This statutory language is starkly different than the language of Section 1500.3.  Section 1500.3 does not mention any individual's rights, nor does it explicitly allow review in particular courts.  In *O'Neal*, the court held that statutory language that provided that "the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter" created a waiver of sovereign immunity.  *O'Neal v. Dep't of Army of United States*, 742 A.2d 1095, 1099 (Pa. Super. Ct. 1999).  This language also bears no resemblance to the language of Section 1500.3.  Section 1500.3 does not explicitly provide a grant of jurisdiction, from which the Court could find a waiver of sovereign immunity.  Indeed, *Ro Ane* and *O'Neal* offer prime examples of what unambiguous language would look like.  Section 1500.3 does not.

Second, and equally important, only Congress can waive sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399 (1976) ("[E]xcept as **Congress** has consented to a cause of action against the United States, there is no jurisdiction . . . in any [ ] court

to entertain suits against the United States." (emphasis added) (internal quotation marks omitted)); *F.A.A. v. Cooper*, 132 S. Ct. 1441, 1449 (2012) ("We have said on many occasions that a waiver of sovereign immunity must be unequivocally expressed in **statutory text**." (emphasis added) (internal quotations omitted)). **Regulations** promulgated by an executive agency cannot waive federal immunity. *Pittman v. Sullivan*, 911 F.2d 42, 46 (8th Cir. 1990) ("We are constrained, however, by the principle that administrative regulations cannot waive the federal government's sovereign immunity." (internal quotation marks omitted)); *Heller v. United States*, 776 F.2d 92, 98 n.7 (3d Cir. 1985) ("[G]overnment regulations alone, without the express intent of Congress, cannot waive sovereign immunity."). The LPA cites no authority – in NEPA, any statutory language regarding the CEQ, or elsewhere – to the contrary. Thus, even if Section 1500.3 contained an explicit waiver of sovereign immunity, the regulation could not waive sovereign immunity because it is not an act of Congress. In sum, without delving into the intricacies of the LPA's arguments regarding a NEPA cause of action, or its arguments as to ripeness and standing, the Court concludes that the LPA has failed to show that NEPA's regulations contain the requisite waiver of sovereign immunity that this Court would need in order to exercise jurisdiction over the cause of action the LPA derives from Section 1500.3. As a result, the Court will grant the FTA's motion to dismiss the LPA's NEPA claim against it.

III.     MET COUNCIL'S MOTION TO DISMISS

    A.     NEPA and MEPA

        1.     Subject Matter Jurisdiction

            a.     NEPA

The Met Council's chief argument is that, because NEPA and its regulations provide no freestanding right of action, *Sierra Club v. Kimbell*, 623 F.3d 549, 558-59 (8th Cir. 2010), the Court lacks subject-matter jurisdiction over the LPA's only federal claim and therefore lacks any supplemental jurisdiction over the LPA's remaining two state law claims. 28 U.S.C. 1367(a). The Council is correct that the Eighth Circuit, along with other circuits, has repeatedly held that NEPA's statutory text provides no right of action. *Sierra Club v. Kimbell*, 623 F.3d at 558-59 ("Although NEPA does not provide a private right of action, the [APA] permits judicial review of agency action in this context."); *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d at 813 ("Neither . . . NEPA[] nor the statutes governing the Corps expressly provide for judicial review of the agency actions at issue. Therefore, jurisdiction is limited to judicial review under the APA . . . ."); *Friends of the Norbeck v. U.S. Forest Serv.*, 661 F.3d 969, 973 (8th Cir. 2011) ("While NEPA does not authorize a private right of action, the [APA] permits judicial review of whether an agency's action complied with NEPA."); *N. States Power Co. v. Fed. Transit Admin.*, No. 01-295, 2002 WL 31026530, at *4 n.4 (D. Minn. Sept. 10, 2002) (stating that "[t]his Court has already determined that . . . NEPA does not provide for either a private cause of action or an independent basis for review"); *see also, e.g.*, *San Carlos Apache Tribe v. U.S.*, 417 F.3d 1091, 1097 (9th Cir. 2005) ("A

fundamental and oft-quoted principle of environmental law is that there is no private right of action under NEPA"); *Noe v. Metro. Atlanta Rapid Transit Auth.*, 644 F.2d 434, 437-40 (5th Cir. 1981) ("[T]o the extent the legislative history indicates any Congressional attitude, it indicates a desire not to provide a remedy for private individuals who may be injured by a violation of NEPA.").

The Met Council and the FTA also make strong arguments that NEPA's regulations, specifically 40 C.F.R. § 1500.3, do not provide a cause of action. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Both the Government and respondents argue that the **regulations** contain rights-creating language and so must be privately enforceable, but that argument skips an analytical step.   Language in a regulation . . . may not create a right that Congress has not." (citation omitted)).

But these arguments rely in part on the availability of a cause of action under the APA, and the Eighth Circuit cases the defendants cite all involve a federal-agency – and not a state or local – defendant. *See, e.g.*, *Sierra Club v. Kimbell*, 623 F.3d at 558-89. The LPA's claims at issue in this motion are not against a federal actor; instead they are against the Met Council, "a public corporation and political subdivision of the state." *See N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1052 (8th Cir. 2004). Consequently, the LPA did not bring these claims under the APA, which provides for a cause of action against **federal** government agencies.[11]   *See S.C. Wildlife Fed'n v.*

---

[11] Some courts have considered injunction requests against state or local defendants for violating NEPA, when those defendants are sufficiently intertwined with the federal government on a project such that the project constitutes a major federal action. *See Fund for Animals, Inc. v.*

(Footnote continued on next page.)

*Limehouse*, 549 F.3d 324, 330-31 & n.5 (4th Cir. 2008) ("Neither NEPA nor the [APA] in itself provides a cause of action against state actors."); *Karst Envtl. Educ. & Prot., Inc. v. E.P.A.* (*Karst*), 475 F.3d 1291, 1298 (D.C. Cir. 2007) ("And because nothing in the APA authorizes claims against nonfederal entities . . . we shall affirm the district court's dismissal of the complaint against local intervenors."); *Highland Vill. Parents Grp. v. U.S. Fed. Highway Admin.*, 562 F. Supp. 2d 857, 862 (E.D. Tex. 2008) ("The court begins, however, by noting that the APA does not provide a cause of action for the Plaintiff against the state agency defendants.").

The LPA argues that the Court should, in this case, recognize a NEPA cause of action for the LPA against the Met Council, in large part because the Met Council's actions vis-à-vis the SWLRT are effectively limiting the options that will be considered

---

(Footnote continued.)

*Lujan*, 962 F.2d 1391, 1397 (9th Cir. 1992) (stating the Ninth Circuit's doctrine that "[n]onfederal defendants may be enjoined if federal and state projects are sufficiently interrelated to constitute a single federal action for NEPA purposes" (internal quotation marks omitted)); *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012) (citing *Fund for Animals*, conceding that the "APA does not apply to state agencies," but deciding "that jurisdiction over the [state transportation] Secretary may be exercised" due to the state's "substantial role" in the project and that the state was "working in tandem with federal agencies" (internal quotation mark omitted)); *Sierra Club v. U.S. Dep't of Agric.*, 777 F. Supp. 2d 44, 60 (D.D.C. 2011) ("Furthermore, if the level of federal involvement in the nonfederal project amounts to the creation of a joint venture or partnership between the federal agency and a non-federal entity, federal courts have considered the arrangement to be a major federal action such that even the non-federal entity may be enjoined from violating NEPA.").

Here, there is no dispute that the SWLRT is a major federal action. But that fact alone is not enough to apply the APA to the Met Council in this case. Irrespective of whether state or local defendants can, under extraordinarily limited circumstances, be subjected to the requirements of NEPA via the APA, those circumstances are not present here. All of these cases extend review to state agencies only by way of the APA, which requires **final** agency action. The LPA concedes that there is no final agency action here. Thus, this line of cases offers no support for allowing the LPA to bring a NEPA claim against the Met Council.

during the FTA's environmental review process and therefore affecting the LPA's NEPA rights.   The LPA cites *Limehouse*, a Fourth Circuit case in which a plaintiff sued the Executive Director of the South Carolina Department of Transportation, along with federal defendants, to delay construction of a bridge between two South Carolina towns until the federal agency involved had time to conduct further environmental review. *Limehouse*, 549 F.3d at 328.   The federal defendants had completed an FEIS and ROD, but the plaintiff sought reconsideration of the FEIS.   *Id.*   The court noted that no cause of action existed for plaintiffs against the state-actor defendant, either under the APA or NEPA.   *Id.* at 330.   But the court also cited Fourth Circuit precedent that established that "federal courts have 'a form of pendent jurisdiction . . . based upon necessity' over claims for injunctive relief brought against state actors in order to preserve the integrity of federal remedies."   *Id.* (quoting *Arlington Coal. on Transp. v. Volpe*, 458 F.2d 1323, 1329 (4th Cir. 1972)).   The court concluded that a cause of action under NEPA exists, stating that

> [t]he federal statute and our precedent permit suit against a state actor where a party seeks to preserve federal rights under NEPA pending the outcome of federal procedural review.   Because state actors could significantly alter a project's environmental impact, a federal court may hear a suit for injunctive relief.   Were it otherwise, state action could render a NEPA violation a "*fait accompli*" and eviscerate the federal remedy.

*Id.* at 331.   The court noted that in recognizing this cause of action, it was protecting the plaintiff's interest in the federal defendants' reconsideration of the FEIS.   *Id.*   It acknowledged that the state defendant would not actually begin construction without federal approval, but stated that "actions taken by the state short of building the road

could change the cost of proposed alternatives, thereby impacting the federal agency's review and reconsideration." *Id.*

The Met Council argues that this case is in a completely different procedural posture than *Limehouse*, and that even if *Limehouse* is directly on point, it runs counter to Eighth Circuit precedent. The Met Council is correct that this case arises in a different procedural context. In *Limehouse*, the federal defendants had completed a DEIS, FEIS, and ROD for the project and the state defendant was on the brink of beginning construction. *Id.* at 329. The plaintiffs merely sought reconsideration of an FEIS. *Id.* at 331. Here, the FTA and Met Council have not completed a supplemental DEIS, much less the FEIS or ROD.

This argument misses the point of *Limehouse*, however. That decision was not focused on whether final agency action had occurred. *Id.* at 330-31. The final-agency-action requirement comes from the APA. NEPA Law and Litig. 2d § 4.28 (2014) ("The ripeness doctrine is also related to the requirement, codified by the [APA], that limits judicial review to a final agency action for which there is no adequate remedy." (internal quotation marks omitted)); *see also Karst*, 475 F.3d at 1297-98 (rejecting a plaintiff's argument, based on outdated case law, that it did not need to allege final agency action in asserting a NEPA claim, on intervening decisions interpreting the APA that made clear that NEPA claims needed to be asserted under the APA and needed to follow final agency action). *Limehouse* involved a narrow, unique, and limited cause of action arising under NEPA, and not under the APA. 549 F.3d at 330-31. Here, the LPA concedes that the NEPA environmental review process is not final, but seeks instead to intercede before

that environmental review process is rendered meaningless by the Met Council's actions

under the municipal consent regime.  Like the plaintiff in *Limehouse*, the LPA attempts to

stop "state action [that] could render a NEPA violation a *fait accompli* and eviscerate the

federal remedy."  *Limehouse*, 549 F.3d at 331 (internal quotation marks omitted).  The

Fourth Circuit noted that this action did not need to be as significant as actually

constructing the bridge in question, but could refer only to state actions, short of

construction, that "could change the cost of proposed alternatives, thereby impacting the

federal agency's review and reconsideration."  *Id.*  Here, the LPA has certainly provided

sufficient allegations, at least at this early stage of the proceedings, to show that the Met

Council's actions pursuant to the municipal consent process could dramatically alter or

reduce, or change the cost of, the alternatives available to the FTA during its

environmental review. [12]

---

[12] *Limehouse*, and the Fourth Circuit cases it relies on – *Md. Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039, 1042-43 (4th Cir. 1986); *Arlington Coal. on Transp.*, 458 F.2d at 1329 – are distinguishable in that they all involve a plaintiff's attempt to halt construction of a project in order to allow ongoing federal agency review or reconsideration of the relevant environmental analysis to be completed.  *See, e.g., Limehouse*, 549 F.3d at 330-31.  But that fact is not necessary to the holdings in each of those cases.  Moreover, while it is true that final federal review is further away in this case than in the Fourth Circuit cases, this case involves a unique set of facts that warrants the recognition of a cause of action.  Just as the plaintiffs in the Fourth Circuit cases warned of impending construction by a state or local actor, here the LPA warns of a robust approval process that – approval after approval – effectively chooses and builds the route.  *See Md. Conservation Council, Inc.*, 808 F.3d at 1042 ("The decision of the [federal government] to approve the project . . . would inevitably be influenced if the County were allowed to construct major segments of the highway before issuance of a final EIS.  The completed segments would stand like gun barrels pointing into the heartland of the park . . . It is precisely this sort of influence on federal decision-making that NEPA is designed to prevent." (internal quotation marks omitted)).  As a result, while this case does differ slightly in its posture from the Fourth Circuit cases, their reasoning is still applicable here because the alleged effect of

(Footnote continued on next page.)

The more difficult issue is whether Eighth Circuit case law precludes recognizing a federal cause of action under NEPA against the Met Council in this case.  As noted above, the Eighth Circuit case law cited by the Met Council involves NEPA claims brought under the APA against federal actors.  *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d at 812.  Although the Eighth Circuit has repeatedly held that NEPA provides no right of action outside of the APA, *id.* at 813 (noting that NEPA does not "provide for judicial review of the agency actions at issue"), since the APA targets federal agencies, it is not clear that the Eighth Circuit would refuse to recognize a cause of action in a case like this: where a state's actions may "eviscerate the federal remedy." *Limehouse*, 549 F.3d at 331.  Some case law in this circuit could be read as supporting the proposition that NEPA only focuses on federal action and could not provide a cause of action here – and that *Limehouse* is consequently unpersuasive in this circuit, especially given that *Limehouse* relies on long-standing Fourth Circuit precedent that does not exist in this circuit.  *Goos v. I.C.C.*, 911 F.2d 1283, 1293 (8th Cir. 1990) ("NEPA thus focuses on [the] activities of the federal government and does not require federal review of the environmental consequences of private decisions or actions, or those of state or local governments." (internal quotation marks omitted)); *Westmoreland Real Estate, LLC v. City of St. Louis, Mo.*, No. 4:11-1648, 2012 WL 2458403, at *7 (E.D. Mo. June 27, 2012) (in dismissing a NEPA claim against a state actor under 42 U.S.C. § 1983,

_____

(Footnote continued.)

the Met Council's actions in this case is the same as the effect of the defendants' actions in the Fourth Circuit cases.

noting that NEPA is a statute "focuse[d] on [the] activities of the federal government" (internal quotation marks omitted) (citing *Goos*)).   But these cases are distinguishable. The relevant language in *Goos* is mere dicta; and *Westmoreland* involved an attempt to assert a NEPA claim through an entirely different procedural vehicle: Section 1983.

In this case, in light of the unique nature of the robust municipal consent process required by the state statutory regime governing light rail projects, the Court concludes that the reasoning in *Limehouse* is persuasive and recognizes in this case a similar, limited, narrow cause of action against the Met Council.  *Limehouse*, 549 F.3d at 330-31. This cause of action is not a broad one under NEPA.  Instead, it is tied to the regulation under which it was brought, 40 C.F.R. § 1506.1(a), and the particular facts of this case: a massive public transit project which faces a robust municipal consent process under state law that generates political support and approval for a specific route and may effectively limit and alter the choices available during the remaining stages of the environmental review for this project. [13]   Recognizing this cause of action does not mean the LPA has

---

[13] NEPA's focus is on regulating federal agencies.  *Goos*, 911 F.2d at 1293.  A logical question then is what substantive standard applies in a NEPA cause of action against a **state or local actor**, as in this case.  The *Limehouse* court does not elaborate on whether a plaintiff could use this limited cause of action to assert any type of NEPA claim against a state or local defendant, or whether a plaintiff is limited to alleging only that state action will neuter later environmental review and "eviscerate the federal remedy." *Limehouse*, 549 F.3d at 330-31.  The Court need not delve too deeply into this question because, in this case, the LPA makes a substantive NEPA claim that mirrors the substance of the cause of action recognized in *Limehouse*.

The LPA's claim arises under 40 C.F.R. § 1506.1(a); specifically, the provision that bars any action, prior to the issuance of an ROD, that would "[l]imit the choice of reasonable alternatives" for a proposal.  *Id.* § 1506.1(a)(2).  This rule, and the cause of action recognized in *Limehouse*, require roughly the same inquiry from the Court: an examination of whether state or

(Footnote continued on next page.)

already shown that no factual dispute exists as to whether the Met Council's actions have violated NEPA.  Instead, it recognizes a cause of action based on the well-pled factual allegations in the LPA's complaint and simply allows the group to proceed to the summary judgment stage.  Furthermore, such a conclusion does not ignore that NEPA's regulations direct federal agencies to "[i]ntegrate the requirements of NEPA with other planning and environmental review procedures required by law . . . so that all such procedures run concurrently rather than consecutively."  40 C.F.R. § 1500.2(c); *see also id.* § 1506.1(d) ("This section does not preclude development by applications of plans or designs or performance of other work necessary to support an application for Federal, state or local permits or assistance."); *id.* § 1502.14(e) (noting that an EIS may "[i]dentify the agency's preferred alternative or alternatives").  The Court passes no judgment at this point about whether the municipal consent process has violated the letter or spirit of the environmental review processes required by law, or whether it is operating faithfully within the confines of Section 1500.2 and Section 1506.1(d).  That determination is a substantive one that the Court will make later.

The Court acknowledges that, in determining whether a private cause of action exists, the key question is whether congressional intent exists to authorize such a right of

_____

(Footnote continued.)

local action will limit the alternatives considered during environmental review and thereby "eviscerate" any chance of obtaining a federal remedy under NEPA and the APA, because the state or local actor will have taken action that will be impossible for a plaintiff to reverse by later suing a federal actor.  As a result, in recognizing a limited NEPA cause of action against the Met Council, similar to the one recognized in *Limehouse*, the Court will consider the LPA's **substantive** allegations brought under Section 1506.1(a).

action.  *See Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 773 F.3d 58, 63 (8th Cir. 2014).

As discussed above, many courts have concluded that NEPA's statutory text and

legislative history do not contain any intent to create a private right of action.  *See, e.g.*,

*Noe*, 644 F.2d at 437-38.  But the Court is not recognizing the sort of general cause of

action asserted by plaintiffs and rejected by courts in cases like *Noe*.  Instead, the cause of

action recognized here is like the one in *Limehouse*: narrow and based on the fact that

state action – here pursuant to Minnesota's robust municipal consent regime – could

affect the options under consideration during the environmental review process and

thereby "eviscerate" any federal remedy later available to the LPA.  *Limehouse*, 549 F.3d

at 331; *see also* 40 C.F.R. § 1506.1(a).  And while a case like *Karst*, 475 F.3d at 1293,

1296-98, might appear to argue for a different result, that case is distinguishable because

it involves a suit against federal, and not state or local, actors.[14]  Given the particular

circumstances of this case, this Court cannot imagine that Congress would intend for a

major transit project to escape full and thorough NEPA review because – despite the

unique scope of the consent process required under state law for local governments –

NEPA offered no cause of action against a state actor working in tandem with the federal

government and taking significant action prior to the completion of the environmental

---

[14] The Met Council is correct that courts have rejected other plaintiffs' attempts to argue that jurisdiction exists under 40 C.F.R. § 1500.3.  *See Cent. Delta Water Agency*, 653 F. Supp. 2d at 1093; *Haw. Cnty. Green Party v. Clinton*, 124 F. Supp. 2d 1173, 1199 (D. Haw. 2000).  The LPA has also asserted an implied cause of action that draws on the Fourth Circuit's persuasive reasoning in *Limehouse*, which does not rely on Section 1500.3 alone.  The cases cited by the Met Council are not directly on point.

review process.[15]  In sum, the Court concludes a limited cause of action exists in this case against the Met Council.  Consequently, the Court may exercise supplemental jurisdiction over the LPA's two state law claims.

### b.    MEPA

The Met Council contends that no cause of action exists under MEPA because – although the statute creates an independent cause of action – the statutory regime requires final agency action.  *See* Minn. Stat. § 116D.04, subd. 10 (detailing the procedures and timelines for a person "aggrieved by a **final** decision" under MEPA to seek judicial review (emphasis added)); *see also Cnty. of Dakota v. City of Lakeville*, 559 N.W.2d 716, 721 (Minn. Ct. App. 1997) (concluding that the district court lacked jurisdiction to hear a MEPA claim because the appellants "brought their MEPA action before the [agency] made its decision on the need for an EIS").  The LPA argues that an implied right of action exists under Minnesota Rule 4410.3100, subpart 2, which states that a government agency "shall not take any action with respect to [a] project, including the acquisition of property, if the action will prejudice the ultimate decision on the project . . . until the final EIS has been determined adequate."  *See also id.* ("An action prejudices the ultimate decision on a project if it tends to determine subsequent development or to limit alternatives or mitigative measures.").

---

[15] To the extent the Met Council argues that municipal consent must precede the environmental review process, so that cities are able to provide advance guidance and feedback as to the options the EIS will consider, it is not clear why cities could not provide feedback through the comment period that follows the issuance of a DEIS and, in this case, a supplemental DEIS.

The Minnesota Supreme Court has stated that "[a] statute does not give rise to a civil cause of action unless the language of the statute is explicit or it can be determined by clear implication." *Becker v. Mayo Found.*, 737 N.W.2d 200, 207 (Minn. 2007).[16] Courts look to the intention of the legislature in determining whether an implied cause of action exists. *Id.* at 207 n.4 (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979)). Under MEPA – in contrast with NEPA, which primarily relies on the APA in order for plaintiffs to enforce it – the Minnesota legislature has made its intent explicitly clear: the statute contains an express cause of action. Minn. Stat. § 116D.04, subd. 10; *see also Nat'l Audubon Soc'y v. Minn. Pollution Control Agency*, 569 N.W.2d 211, 218 (Minn. Ct. App. 1997) ("Thus, MEPA, unlike [the Minnesota Environmental Rights Act], expressly provides a cause of action to challenge an agency's EIS determination."). But MEPA limits judicial review to a "final decision," which the LPA concedes has not occurred in this case. Minn. Stat. § 116D.04, subd. 10.

The Court concludes that the LPA has failed to show that an implied cause of action exists. MEPA provides an express cause of action where there is a "final decision" by a governmental unit. The LPA concedes no such final decision has occurred and instead argues for an implied cause of action, pursuant to MEPA regulations. But this

---

[16] This Court and Minnesota courts have also employed the three-factor test from *Cort v. Ash*, 422 U.S. 66, 78 (1975), for determining whether an implied cause of action exists. *Becker*, 737 N.W.2d at 207 n.4; *see, e.g., Allstate Ins. Co. v. Linea Latina De Accidentes, Inc.*, 781 F. Supp. 2d 837, 848 (D. Minn. 2011) ("In analyzing whether an implied right of action exists, the parties address whether (1) the plaintiff belongs to the class for whose benefit the statute was enacted, (2) the legislature indicated an intent to create a civil remedy, and (3) implying a remedy would be consistent with the underlying purposes of the statute." (citing *Becker*, 737 N.W.2d at 207 n.4)).

argument contravenes the legislature's clear intent to limit the scope of judicial review to those cases in which a final decision has been made.  Minn. Stat. § 116D.04, subd. 10. The LPA has failed to show that the legislature also intended for an implied cause of action – broader in scope than its express counterpart – to arise under Minnesota Rule 4410.3100, subpart 2.  This Court will not imply a broader cause of action here than what the legislature clearly intended in its express cause of action.

This decision is different than the Court's decision as to the LPA's NEPA claim against the Met Council, but the statutory regime is different as well.  There, the Court is recognizing a right of action under an environmental law that regulates federal agencies, even though final federal agency action has not occurred under the APA, because the LPA has plausibly alleged that the Met Council's actions will effectively eviscerate its chance of obtaining a federal remedy under NEPA against the FTA at a later date. *Limehouse*, 549 F.3d at 330-31.  Here, the state statute at issue, which unlike the APA and NEPA is directly applicable to the Met Council, leaves no uncertainty as to how a plaintiff should challenge the Met Council's actions.  It provides an explicit cause of action and limits that cause of action to challenging a final decision.  In sum, the Court concludes it lacks jurisdiction to hear the LPA's MEPA claim and will dismiss that claim without prejudice.

## 2.    Ripeness

The Met Council argues that the LPA's NEPA claim is not ripe for review.  The ripeness doctrine, which "is drawn both from Article III limitations on judicial power and

- 34 -

from prudential reasons for refusing to exercise jurisdiction," is "designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003) (internal quotations omitted).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Parrish v. Dayton*, 761 F.3d 873, 875-76 (8th Cir. 2014) (internal quotations omitted).  In order to show ripeness, a plaintiff must at least show that a threatened injury is "certainly impending." *Id.* at 876.

To determine whether an administrative decision is ripe for judicial review, courts examine both "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner.* 387 U.S. 136, 149 (1967).  The fitness prong looks to whether the case would "benefit from further factual development" and targets for review cases that present purely legal questions.  *Pub. Water Supply Dist. No. 10 of Cass Cnty., Mo. v. City of Peculiar, Mo.*, 345 F.3d 570, 573 (8th Cir. 2003).  The hardship prong looks to the harm a plaintiff would suffer, both damages and as a result of behavior modification in the absence of judicial review. *Nebraska Pub. Power Dist. v. Midamerican Energy Co.*, 234 F.3d 1032, 1038 (8th Cir. 2000).  Both of these factors must be satisfied "to at least a minimum degree."  *Id.* at 1039.

In assessing a NEPA claim, it is also helpful to consider additional case law regarding NEPA and ripeness.  The Supreme Court in *Ohio Foresty Association, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998), in concluding that a challenge to a U.S. Forest Service was not ripe, compared a challenge to the forest plant to a challenge under NEPA.  The Court stated that "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper."  *Id.*  In other words, the Court made a short declaration regarding NEPA claims that appears to obviate the need for a lengthy ripeness analysis.

On the other hand, some courts have labeled that language in *Ohio Forestry* as dicta and refused to use it to recognize ripeness where an agency has not taken final agency action.  *See, e.g.*, *New York v. U.S. Army Corps of Eng'rs*, 896 F. Supp. 2d 180, 196 (E.D.N.Y. 2012) ("Plaintiffs interpret this language as eliminating prudential ripeness as an inquiry in NEPA cases.  This court disagrees.  First, the *Ohio Forestry* language is dicta, because the Supreme Court was not confronted with a NEPA challenge; therefore, this court need not follow it. . . .  Second, the court does not believe the Supreme Court would intend to attempt to abrogate its prudential ripeness case law as to NEPA claims in a few sentences of dicta. . . .  [T]he implication of the Supreme Court's comment about a hypothetical NEPA challenge is that such a challenge would be ripe at the time a final plan was issued."); *Cent. Delta Water Agency*, 653 F. Supp. 2d at 1084-85 ("Plaintiffs suggest that this passage means that a violation of NEPA procedures, at any time during the NEPA process, is automatically ripe for review.  This reading of

*Ohio Forestry* is unreasonable and unjustifiably interventionist, as it would effectively grant any party the right to judicially interfere with the administrative process without regard to ripeness in any NEPA procedural injury case.").  Other courts have concluded the opposite.  *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1264 (10th Cir. 2002) ("*Ohio Forestry* establishes that a claim for the alleged failure of the DOE to comply with the NEPA (and presumably the ESA) is ripe at the time of failure, assuming that the plaintiff has standing."); *see also id.* at 1264-66 (concluding that the plaintiff had standing to sue the Department of Energy, and that the claim was ripe, where the challenged action was the granting of an easement, but where the result with which the plaintiff was concerned – the construction of a road – still required further DOE approval before completion).

   *Sierra Club v. U.S. Army Corps of Engineers*, 446 F.3d 808, 816 (8th Cir. 2006) is on point.  In that case, the Eighth Circuit concluded that a claim was ripe where the Army Corps had issued a FONSI – which the court labeled final agency action – even though the Army Corps and Federal Emergency Management Agency needed to take further actions to finalize the project.  *Id.*  The court stated that "[i]njury under NEPA occurs when an agency fails to comply with that statute. . . .  [W]e have little difficulty concluding that this NEPA dispute was ripe for judicial review when the lawsuit was filed in December 2003."  *Id.*  In concluding the claim was ripe, the court did not engage in a lengthy ripeness analysis, but instead briefly cited to the Supreme Court's dicta in *Ohio Forestry*.  *Id.*

The Eighth Circuit's analysis in *Sierra Club v. U.S. Army Corps of Engineers* demonstrates that – in the context of a NEPA claim brought pursuant to the APA – the ripeness analysis turns on whether final agency action has occurred.  Indeed, while the court did not engage in a lengthy analysis of the final-agency-action issue in the ripeness section of the opinion, it did so at length in the preceding section and, once it established that the plaintiff was properly challenging final agency action, it essentially presumed ripeness.  *Id.* at 815-16 (concluding that the plaintiff's NEPA claim was valid because the agency's FONSI was "final agency action" and then briefly concluding that both standing and ripeness existed).

Here, however, where the LPA's limited cause of action is against the Met Council and where that cause of action arises under NEPA alone, pursuant to the persuasive reasoning of the Fourth Circuit in *Limehouse*, the LPA need not show final agency action.  Instead, keeping in mind the Eighth Circuit's language in *Sierra Club v. U.S. Army Corps of Engineers*, the Court concludes that the LPA has demonstrated ripeness here.  The LPA has sufficiently alleged a violation of NEPA and its regulations, by alleging that the Met Council's actions in the municipal consent process will effectively narrow, constrain, and eviscerate the remedies available to the LPA.  Assessing whether such a violation has occurred, at this stage, does not require further factual development.  Indeed, the Court need not find at this time that there has, in fact, been a NEPA violation in order for the claim to be ripe for review.  Waiting, however, could allow additional action on the part of the Met Council that would further narrow and alter the alternatives available during the environmental review process.  Thus, action

now is warranted.  In other words, the alleged violation of NEPA and its regulations is a claim that is ripe for this Court's review.  *See id.* at 816 ("Injury under NEPA occurs when an agency fails to comply with that statute.").

### 3.    Failure to State a Claim

The Met Council also argues that the Court should dismiss the LPA's NEPA claims because it has failed to state a plausible claim against the Council under Federal Rule of Civil Procedure 12(b)(6).  The Met Council argues that the municipal consent process has merely involved early planning and approval, which is allowed under NEPA and does not impede the EIS process or eliminate any alternatives: in sum, the municipal consent process has not impermissibly predetermined the SWLRT route.  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 145 (2010) ("Even if a particular agency proposal requires an EIS, applicable regulations allow the agency to take at least some action in furtherance of that proposal while the EIS is being prepared."); *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010) ("A petitioner must meet a high standard to prove predetermination. We now make explicit what was implicit in our previous decisions: predetermination occurs only when an agency **irreversibly and irretrievably** commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, before the agency has completed that environmental analysis-which of course is supposed to involve an objective, good faith inquiry into the environmental consequences of the agency's proposed action." (emphasis added)).

The Court concludes that the LPA has stated a plausible claim at this stage of the proceedings, and will deny the Met Council's Rule 12(b)(6) motion to dismiss the NEPA claim.  The LPA has made significant allegations regarding the Met Council's actions; namely that the Council has led a municipal consent process and spearheaded negotiations with specific cities, and has for all intents and purposes dramatically reduced the number of realistically available routes for the SWLRT, despite the FTA and Met Council's continued environmental review.  (Am. Compl. ¶¶ 34-37.)  Accepting these allegations as true, the LPA has presented at least a plausible claim – at the motion to dismiss stage – that the Met Council has effectively limited "the choice of reasonable alternatives" available during the environmental review process.   40 C.F.R. § 1506.1(a)(2).

The Met Council correctly notes that regulations like 40 C.F.R. § 1506.1(d), which states that Section 1506.1(a) "does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for Federal, State or local permits or assistance," forecast that projects receiving federal funding will also need to obtain state and local approval.   But the LPA does not ignore these regulations.  Instead, it plausibly alleges, at this early stage, that the state's municipal consent process has put the Met Council beyond the scope of Section 1506.1(d).  The Met Council has not merely done additional work to obtain state permits or assistance; it has engaged in serious and intense negotiations to obtain local support of a major public transit project.  (Am. Compl. ¶¶ 34-37.)  And, it alleges those actions make it unlikely that any actor will manage to alter the SWLRT's route.

The case law cited by the LPA supports its NEPA claim.  *See, e.g.*, *Burkholder v. Peters*, 58 Fed. App'x 94, 97-98 (6th Cir. 2003) (concluding that the Ohio Department of Transportation violated Section 1506.1 when it entered a contract for final design work years before the completion of an environmental assessment and a FONSI, but concluding that the Federal Highway Administration's oversight mitigated the violation); *Metcalf v. Daley*, 214 F.3d 1135, 1142-43, 1145-46 (9th Cir. 2000) (ordering the federal defendants to prepare a new Environmental Assessment ("EA"), after concluding that they had violated NEPA by preparing an EA and FONSI after they had already signed two agreements "binding them to support" a tribal whaling proposal that the EA was meant to study).  It is true that the Met Council has not entered any binding contracts; nor has the FTA.  But, certainly at the motion-to-dismiss stage, the Court finds that the LPA's allegations regarding the Met Council's negotiations, which have led to municipal consent, memoranda of understanding, negotiations and agreements with other entities, and pride pronouncements by Met Council officials and local decision makers, are enough to show predetermination along the lines of the contracts described in *Burkholder* and *Metcalf*.  These alleged actions constitute more than the "significant interest" and simple expenditure of funds the court determined were not irretrievable and irreversible in *Hawaii County Green Party v. Clinton*, 124 F. Supp. 2d at 1196.  These alleged actions arguably go beyond the simple selection of a preferred alternative, and leave little practical likelihood that any other route will be selected.   At a minimum, they demonstrate that the LPA's NEPA claim is better resolved at the summary judgment stage.  *Burkholder*, 58 Fed. App'x. at 102 (deciding a NEPA claim, similar to the one in

this case, at the summary judgment stage).  In sum, the Court concludes that the LPA has stated a plausible NEPA claim against the Met Council.

### B.      Municipal Consent

#### 1.      Implied Cause of Action

Finally, the Met Council argues that no cause of action exists under the state's municipal consent statutes and that, even if it did, the LPA has not sufficiently stated a cause of action.  As noted above, "[a] statute does not give rise to a civil cause of action unless the language of the statute is explicit or it can be determined by clear implication." *Becker*, 737 N.W.2d at 207.  Courts look to the intent of the legislature in determining whether an implied cause of action exists.  *Id.* at 207 n.4.  "In analyzing whether an implied right of action exists, the parties address whether (1) the plaintiff belongs to the class for whose benefit the statute was enacted, (2) the legislature indicated an intent to create a civil remedy, and (3) implying a remedy would be consistent with the underlying purposes of the statute."  *Allstate Ins. Co. v. Linea Latina De Accidentes, Inc.*, 781 F. Supp. 2d 837, 848 (D. Minn. 2011) (citing *Becker*, 737 N.W.2d at 207 n.4)).

Here, the LPA and its members – public citizens impacted by the light rail project – are exactly the types of persons for whose benefit the statute was enacted.  *Id.*  Indeed, the municipal consent statutes lay out a public hearing process that is specifically designed to garner public input and support, indicating that the legislature sought to protect the public with its light rail statutes.  *See, e.g.*, Minn. Stat. § 473.3994, subd. 2. While the Met Council is correct that the statutory scheme is largely styled as regulations

for agencies constructing transit projects, *see Alliance for Metro. Stability v. Metro. Council*, 671 N.W.2d 905, 916 (Minn. Ct. App. 2003), it also contains important procedural requirements, similar to those that exist under NEPA and MEPA, that clearly have in mind the individuals protected by a robust approval and consent process for light rail projects. *See, e.g.*, Minn. Stat. 473.3994, subd. 2.

Implying a right of action also would be consistent with the purposes underlying the statute, which clearly are, in part, to ensure an informed public and informed local decision makers prior to the construction of any light rail project. Minn. Stat. § 473.3994, subds. 2 and 3. Indeed, the goals underlying the state's transit statutes in general are "to arrange" transit services that "meet the needs of all people in the metropolitan area." Minn. Stat. § 473.371, subd. 2(b). If the public, and the decision makers participating in the municipal consent process, are not properly and fully informed, the statutory regime will not meet its goals of creating a system that meets the needs of all people.

Finally, the Court concludes that there is sufficient evidence of legislative intent to provide a cause of action; at a minimum there is no evidence to the contrary. The Met Council contends that the municipal consent process itself, Minn. Stat. § 473.3994, subd. 3, is evidence that the statutory scheme already contains a remedy: if the Met Council has violated state law, a municipality can vote to disapprove. The Council contends that this remedy precludes the Court from implying a private right of action. But this argument ignores the realities of local politics. The municipal consent statutes contain requirements, like the one in Minnesota Statute § 473.3994, subd. 3, which the

LPA alleges the Met Council has violated.  If a city's decision makers decide they want a project, regardless of whether they have received sufficient environmental review documents, they could approve it in any event.  Then, the Met Council's reading of the statute would leave the public with no redress for a violation of the statute's procedural requirements.  That result runs contrary to a statutory scheme that seeks to open to the public the process of approving a light rail project, in order for it to serve all members of the public.  In sum, the Court concludes that an implied cause of action exists under the state's light rail municipal consent statutes.

### 2.  Failure to State a Claim

The Met Council also argues that the LPA has failed to state a claim under the municipal consent statutes.  The Met Council concedes that Section 473.3994, subd. 3, requires a city to have access to "the physical design component of the preliminary design plans" before voting on a project, and that "preliminary design plans" include a full DEIS, Minn. Stat. § 473.3993, subd. 2.  Nevertheless, it argues that "the physical design component" is all that is required of "preliminary design plans," and that the "physical design component" is more limited than the full DEIS.  The Met Council cites nothing in its briefs that specifically defines "physical design component."   But Minnesota Statute § 473.3993, subd. 2(1), discusses preliminary plans for the "physical design of facilities" as "including location, length, and termini of routes; general dimension, elevation, alignment, and character of routes and crossings; whether the track is elevated, on the surface, or below ground."  The statute then describes a separate aspect

of the preliminary plans: the plans "for intermodal coordination."  Minn. Stat.
§ 473.3993, subd. 2(2).  Then, the statute states that the "**preliminary design plan
includes the**" DEIS, Minn. Stat. § 473.3993, subd. 2 (emphasis added), which implies that
the environmental analysis is a part of **both** aspects of the preliminary plan: both the
physical design and the intermodal coordination.  The environmental analysis, which is in
a separate, unnumbered portion of the statute, does not appear to be its own separate
portion of the preliminary design plan.  Instead, it appears to be an integral part of each
piece of the design plan: the physical design and the intermodal coordination.  Thus, a
physical design component, without an accompanying environmental analysis, would
seem to give the cities less than they need to provide informed municipal consent.  Minn.
Stat. § 473.3994, subd. 3.  At a minimum, the LPA has made sufficient allegations to get
beyond the motion-to-dismiss stage.  Therefore, the Court will deny the Met Council's
motion to dismiss as to the LPA's claim based on the state's light rail transit municipal
consent statutory regime.

## CONCLUSION

No one should read more into this opinion than what it is: a determination that the
Court has jurisdiction to hear the LPA's cause of action against the Met Council under
NEPA and under the State's municipal consent statutes for light rail construction.  The
LPA has sufficiently stated a cause of action under these two statutes.  The question
presented is whether under the unique facts of this case the Met Council has improperly
limited the choices available during the remaining stages of environmental review under

NEPA.  Whether the LPA can demonstrate sufficient facts to obtain summary judgment and the relief sought is a separate matter to be determined at a later time.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      The FTA's Motion to Dismiss [Docket No. 30] is **GRANTED**.  The LPA's claim against the FTA is dismissed without prejudice.

2.      The Met Council's Motion to Dismiss [Docket No. 36] is **GRANTED in part** and **DENIED in part.**

    a.      The motion is **GRANTED** as to the LPA's MEPA claim.   The LPA's MEPA claim against the Met Council is dismissed without prejudice.

    b.      The motion is **DENIED** as to the LPA's NEPA and state municipal consent statute claims.

DATED:  March 6, 2015                                    s/ John R. Tunheim
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                    United States District Judge