| | |
|---|---|
| LAKES AND PARKS ALLIANCE OF MINNEAPOLIS, | Civil No. 14-3391 (JRT/SER) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| THE METROPOLITAN COUNCIL, | |
| Defendants. | |

Lewis A. Remele, Jr., and J. Scott Andresen, **BASSFORD REMELE, PA**, 33 South Sixth Street, Suite 3800, Minneapolis, MN 55402; Thomas L. Johnson and Joy Reopelle Anderson, **GRAY PLANT MOOTY MOOTY & BENNETT, PA**, 80 South Eighth Street, Suite 500, Minneapolis, MN 55402, for plaintiff.

Charles N. Nauen, David J. Zoll, and Kristen G. Marttila, **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401; and Ann K. Bloodhart, **METROPOLITAN COUNCIL: OFFICE OF GENERAL COUNSEL**, 390 Robert Street North, St. Paul, MN 55101; for defendant Metropolitan Council.

Defendant Metropolitan Council ("Met Council") is leading the effort to build a new light rail line that connects downtown Minneapolis with the southwestern Twin Cities suburbs ("Southwest Light Rail" or "SWLRT"). The Met Council hopes to receive federal funding for the project and the federal environmental review process mandated by the National Environmental Policy Act ("NEPA") is underway. A draft environmental impact statement ("DEIS") and supplemental DEIS ("SDEIS") have already been prepared, and a final EIS ("FEIS") and record of decision ("ROD") are expected in the

next year. The Federal Transit Administration ("FTA") has provided little funding at this point, and will eventually decide whether to participate in the project based on the environmental review. While the environmental review process is ongoing, however, the Met Council has obtained approval from the relevant municipalities along the proposed line, even negotiating a compromise with the cities of Minneapolis and St. Louis Park for the route the line will take through the Kenilworth Corridor area of Minneapolis. This compromise, and the plan approved through the municipal consent process, were not discussed in the initial DEIS.

Plaintiff Lakes and Parks Alliance of Minneapolis ("LPA") brings this action against the FTA and the Met Council, arguing that the FTA and the Met Council have both violated NEPA by using the municipal consent process to close off available options before the environmental review process is complete. The LPA has also sued the Met Council under state environmental review laws (the Minnesota Environmental Policy Act or "MEPA") and the state municipal consent statutes for light rail projects. In a prior Order, the Court dismissed the LPA's claim against the FTA, and dismissed the LPA's MEPA claim against the Met Council. However, the Court denied the Met Council's motion to dismiss the LPA's NEPA and municipal consent statute claims. Before the Court is the LPA's motion for summary judgment on its NEPA and municipal consent statute claims against the Met Council. Because the LPA has not shown that the Met Council has irreversibly and irretrievably committed to a specific SWLRT route, the Court will deny the LPA's summary judgment motion.

**BACKGROUND**[1]

## I.    PARTIES AND THE SOUTHWEST LIGHT RAIL TRANSIT PROJECT

The LPA is a Minnesota non-profit corporation, whose members live near and utilize the Kenilworth Corridor area in Minneapolis.  (Am. Compl. ¶ 4, Nov. 3, 2014, Docket No. 12.)  The Met Council is the regional policy-making body, planning agency, and transit services provider for the Twin Cities metropolitan region.  (*Id*. ¶¶ 5-6.)  The Met Council is the responsible governmental unit for the environmental review of the SWLRT, and the entity in charge of planning and constructing the project.  (*Id*.)

The SWLRT is a proposed light rail line that would run from downtown Minneapolis through the communities of St. Louis Park, Hopkins, Minnetonka, and Eden Prairie.  (Aff. of Joy R. Anderson ("Anderson Aff."), Ex. 5 at 31, Nov. 3, 2014, Docket No. 16.)  The project's estimated budget is $1.65 billion[2]; funding for the SWLRT will be

---

[1] The Court articulated the factual background of this case in detail in its prior Order. *Lakes & Parks Alliance of Minneapolis v. Fed. Transit Admin.*, --- F. Supp. 3d ---, 2015 WL 999945, at *1-*5 (D. Minn. 2015) (*LPA I*).  The Court will recount the relevant facts here, drawing on the description found in that decision and the additional materials provided with the summary judgment briefs.

[2] Analysis released in April indicates that the cost of the SWLRT is actually closer to $2 billion, due to poor ground conditions and soil contamination along the route.  *See* Paul Walsh, *New $2B price tag puts SW light rail at risk*, Star Tribune (May 2, 2015), http://www.startribune.com/april-27-new-2b-price-tag-puts-southwest-light-rail-at-risk/301418451/.  The Met Council has considered some $500 million in cuts to the project to bring its costs down.  *See* Janet Moore, *Millions in cuts proposed for Southwest LRT line*, Star Tribune (May 21, 2015), http://www.startribune.com/500m-in-cuts-proposed-for-southwest-lrt-line/304445241/.

More recently, the Met Council approved $250 million in cuts to the project, bringing its total cost to $1.744 billion.  *Met Council cuts $250M to save Southwest Corridor light-rail project*, Pioneer Press (July 9, 2015), http://www.twincities.com/localnews/

(Footnote continued on next page.)

provided by the FTA, the state of Minnesota, the Counties Transit Improvement Board, and the Hennepin County Regional Railroad Authority ("HCRRA"). (*Id.*, Ex. 1 at 1.)

The current plans call for the SWLRT to pass through the Kenilworth Corridor. (*Id.*, Ex. 22 at 3.) The corridor contains a popular bicycle and pedestrian trail, along with existing freight rail tracks; it is one and one-half miles in length and lies between Cedar Lake and Lake of the Isles in Minneapolis. (*Id.*, Ex. 5 at 31; *id.*, Ex. 10 at 17.) Under the current plans, SWLRT trains traveling northbound would pass through the southern half of the Kenilworth Corridor in two tunnels, and then emerge from the ground to pass over the water channel that connects Cedar Lake and Lake of the Isles ("Kenilworth Channel") on a new bridge before continuing through the northern portion of the corridor above ground.[3] (*Id.*, Ex. 15 at 11.) The existing freight rail tracks would remain in the corridor, but would pass over the Kenilworth Channel on a new, separate bridge. (*Id.*)

## II.    ENVIRONMENTAL REVIEW PROCESS FOR THE SWLRT

NEPA requires federal agencies to consider the environmental impacts of and prepare an EIS for all "major Federal actions significantly affecting the quality of the

_____
(Footnote continued.)

ci_28456691/met-council-cuts-250m-save-southwest-corridor-light. The cuts, which appear to include the elimination of a station at the end of the line, do not appear to change the portion of the line at issue in this case. *Met Council backs cuts to put Southwest light rail back on track*, MPR News (July 8, 2015), http://www.mprnews.org/story/2015/07/08/southwest-light-rail-cuts.

[3] The plan to route SWLRT trains through a tunnel in the southern portion of the corridor, but above ground in the northern portion ("South Tunnel Deal" or "South Tunnel Plan"), was a compromise reached through extensive negotiations between the Met Council and the City of Minneapolis in the summer of 2014. (Anderson Aff. Ex. 15.)

human environment." *Sierra Club v. U.S. Forest Serv.*, 46 F.3d 835, 837 (8th Cir. 1995) (internal quotation marks omitted). The SWLRT is a major governmental action that requires preparation of an EIS pursuant to NEPA.[4] (Anderson Aff., Ex. 6 at 7.)

### A.    The Scoping Process for the SWLRT Project

The first step in the environmental review process is the Scoping Process. 40 C.F.R. § 1501.7; (Anderson Aff., Ex. 4 at 10.) This process is also referred to as the Alternatives Analysis. (Aff. of Nani Jacobson ("Jacobson Aff."), Ex. 2, Feb. 3, 2015, Docket No. 60.) The purpose of the Scoping Process is: (1) "to obtain public input on the project purpose and need"; (2) "to identify appropriate alternatives for addressing the purpose and need"; and (3) "to identify those environmental issues associated with the proposed project that require detailed analysis in the DEIS." (Anderson Aff., Ex. 4 at 11.)

A Scoping Process for the SWLRT project was performed in fall 2008 by the HCRRA, which was responsible for conducting the first portion of the environmental review. (*Id.* at 9.) The results of the Scoping Process were included in a January 2009

---

[4] The Met Council notes that the SWLRT is being developed under the FTA's "New Starts Program" (formally titled the Capital Investment Program) and is in the Project Development Phase. (Aff. of Mark W. Fuhrmann ("Fuhrmann Aff.") ¶¶ 10, 13, Feb. 3, 2015, Docket No. 61.) The Project Development Phase of the New Starts Program proceeds simultaneously with NEPA's environmental review process: preparing a DEIS and FEIS, and the FTA's issuance of a ROD. (*Id.* ¶ 12.) After the FTA's issuance of the ROD, the project may enter the Engineering Phase, when it will begin construction and receive a Full Funding Grant Agreement ("FFGA") from the FTA. (*Id.* ¶ 12.) The project can only receive an FFGA after it has secured funding commitments from other non-federal sources. (*Id.*) The Met Council states that the municipal consent process is separate from the New Starts Program's requirements, and from the environmental review process, and is meant to run concurrently with those two processes. (Aff. of Jim Alexander ("Alexander Aff.") ¶ 5, Feb. 3, 2015, Docket No. 62.)

Scoping Summary Report. (*Id*. at 7-9.) The Scoping Summary Report established the alternatives to be analyzed in the DEIS. (*Id*. at 22-23.) None of the proposed alternatives included the construction of tunnels in the Kenilworth Corridor. (*Id*. at 14, 22-23.) The HCRRA unanimously voted to accept the SWLRT Scoping Summary Report on January 27, 2009 as its Scoping Decision. (*Id*. at 22-28.)

Because federal regulations required the Met Council to adopt a locally preferred alternative, the HCRRA recommended to the Council that it adopt a specific route – route LRT 3A – as the locally preferred alternative. (Aff. of Mark W. Fuhrmann ("Fuhrmann Aff.") ¶ 14, Feb. 3, 2015, Docket No. 61.) The Council adopted that route as its preferred alternative on May 26, 2010, including it in its 2030 Transportation Policy Plan ("TPP"). (*Id.*, Ex. 7 at 36; *id.*, Ex. 8 at 53.) Route LRT 3A would reroute the existing freight rail traffic to the MN&S line in St. Louis Park to provide adequate room for the SWLRT tracks to run through the Kenilworth Corridor.[5] (Jacobson Aff., Ex. 2 at 9; Anderson Aff., Ex. 5 at 39, 51-52, 54.)

### B.    The Draft Environmental Impact Statement

The SWLRT was accepted by the FTA into the New Starts Program on September 2, 2011, with the Met Council designated as lead agency. (Jacobson Aff., Ex. 8; *id.*, Ex. 10.) The next step in the environmental review process is the DEIS. 40 C.F.R. § 1502.9(a). Federal regulations dictate that "[t]he [DEIS] shall evaluate all

---

[5] The Scoping Summary did not delve into whether the freight rail line in the Kenilworth Corridor would be re-located, but, as a part of the DEIS, the re-location of freight rail eventually became a part of the LRT 3A alternative. (Jacobson Aff., Ex. 11 at 36-37.)

reasonable alternatives to the action and discuss the reason why other alternatives which may have been considered were eliminated from detailed study." (Anderson Aff., Ex. 4 at 16); *see also* 40 C.F.R. § 1502.14. The HCRRA continued to act as lead agency for purposes of finalizing and publishing the DEIS. (Jacboson Aff., Ex. 10 at 2.)

In October 2012, a DEIS was drafted and released to the public. (Anderson Aff., Ex. 5.) Written comments on the DEIS were accepted for a 60-day time period from October 12 through December 11, 2012. (*Id.* at 30-31.) Nearly 1,000 public comments were received during the public review and comment period following the release of the DEIS. (*Id.*, Ex. 2 at 3.)

The DEIS considered seven alternatives for the SWLRT[6], which included three basic strategies for dealing with the Kenilworth Corridor. (*Id.*, Ex. 5 at 34-37.) The three strategies included:

> (1) rerouting the existing freight rail traffic through the City of St. Louis Park to provide adequate room for the SWLRT in the Kenilworth Corridor; (2) rerouting the existing freight rail through the City of St. Louis Park and running the SWLRT through the Midtown Corridor instead of the Kenilworth Corridor; or (3) co-locating the SWLRT, freight rail, and bicycle/pedestrian trail at-grade through the entire Kenilworth Corridor.

(Am. Compl. ¶ 26.) None of the alternatives provided for the construction of any tunnels in the Kenilworth Corridor. (Anderson Aff., Ex. 5 at 34-37.)

---

[6] The seven alternatives included: a No Build alternative; an Enhanced Bus alternative; two alternatives re-locating the existing freight rail service to the MN&S line in St. Louis Park and running the SWLRT through the Midtown Corridor; two alternatives re-locating the existing freight rail service to the MN&S line in St. Louis Park with the SWLRT running at-grade through the Kenilworth Corridor; and an alternative having the existing freight rail service and the SWLRT co-located at-grade through the Kenilworth Corridor. (Am. Compl. ¶ 26 n.2; Anderson Aff., Ex. 5 at 34-37.)

The co-location alternative was added to the 2012 DEIS analysis in part because the City of St. Louis Park requested that such an alternative be studied. (*Id.*, Ex. 7 at 22-23.) Under the other alternatives, freight rail traffic would have been rerouted through St. Louis Park to make room for the SWLRT. (*Id.*, Ex. 5 at 34-37.) The LPA claims that many St. Louis Park residents expressed concerns with a plan to re-route freight rail through their community. (*Id.*, Ex. 11.) Consequently, the FTA requested that a co-location alternative be included in the 2012 DEIS. (*Id.*, Ex. 7 at 23; Jacboson Aff., Ex. 6.)

However, the 2012 DEIS concluded that the co-location alternative would not adequately preserve the environment and protect the quality of life in the area. (Anderson Aff., Ex. 5 at 52-53.) Instead, the 2012 DEIS recommended route LRT 3A – described above – as the environmentally preferred alternative. (*Id.* at 54.) Nevertheless, as the Met Council points out, the DEIS also noted that the re-location of freight rail under LRT 3A could result in some negative impacts on the area. (Jacobson Aff., Ex. 11 at 97.) After the DEIS was completed, the United States Army Corps of Engineers raised concerns about significant water impacts resulting from the construction of LRT 3A. (*Id.*, Ex. 14 at 116-17.)

After completion of the DEIS, responsibility for the environmental review process, including the completion of the FEIS, was transferred from the HCRRA to the Met Council. (Anderson Aff., Ex. 2.) In July 2013, the Met Council and the FTA gave notice that they intended to publish a Supplemental DEIS ("SDEIS"), which would evaluate potential environmental impacts resulting from changes in the proposed design that were

not documented in the DEIS.  (Jacobson Aff., Ex. 16 at 129; *id.*, Ex. 17; Anderson Aff., Ex. 9 at 21.)  The notice stated that the scope of the SDEIS would include, but was not limited to, the following areas: Eden Prairie LRT alignment and stations; the location of the LRT operations and maintenance facility, freight rail alignments, and other areas where the FTA and the Met Council determined additional information was needed.  (Anderson Aff., Ex. 9 at 21.)  The SDEIS will also be available for public comment.  (Jacobson Aff. ¶ 35.)

In early 2014, the Met Council discussed new options, including moving the SWLRT into tunnels through the Kenilworth Corridor while keeping the freight rail tracks and bicycle/pedestrian trails on the surface.  (Anderson Aff., Ex. 13 at 1.)  In April 2014, the Met Council approved as the "locally preferred alternative" a plan that routed the SWLRT through the Kenilworth Corridor in two shallow tunnels, with trains emerging from the tunnels to pass over the channel between Cedar Lake and Lake of the Isles ("Tunnel Plan").  (*Id.*)

## III.   THE MUNICIPAL CONSENT PROCESS

After the selection of the Tunnel Plan, the Met Council commenced the municipal consent process.  (*Id.*, Ex. 13 at 2.)  "Municipal consent" is required for light rail transit projects by Minnesota Statute § 473.3994, which states that each city and county in which a light rail transit route is proposed to be located must hold a public hearing and vote to approve or disapprove the physical design component of the preliminary design plans for the project.  Minn. Stat. § 473.3994, subds. 2-3.  The preliminary design plans

include the preliminary or draft EIS for the light rail transit facilities proposed.  Minn. Stat. § 473.3993, subd. 2.

In late April 2014, the Met Council submitted the Tunnel Plan to Hennepin County and to the communities of Minneapolis, St. Louis Park, Hopkins, Minnetonka, and Eden Prairie for public hearings and approval.  (Anderson Aff., Ex. 14 at 4-9.)  While several cities voted to approve the Tunnel Plan, the City of Minneapolis and the Met Council entered into negotiations regarding potential changes to the project.  (*Id.*, Ex. 16.)  In July 2014, the City of Minneapolis and the Met Council announced an agreement and non-binding memorandum of understanding ("MOU"), under which the tunnel south of the Kenilworth Channel would remain in place, but the tunnel north of the Channel would be eliminated ("South Tunnel Deal" or "South Tunnel Plan").  (*Id.*, Ex. 15.)  Under this compromise, the SWLRT, freight rail, and the bicycle/pedestrian trail would be co-located at-grade north of the Kenilworth Channel.  (*Id.*)

By August 29, 2014, all six local governments had approved the proposed SWLRT plan, with the City of Minneapolis voting specifically on the South Tunnel Plan.[7]  (*Id.*, Ex. 15; *id.*, Ex. 20.)  St. Louis Park provided its consent, but also signed a

----

[7] In March 2015, the Met Council also signed an MOU with the Minneapolis Park and Recreation Board ("MPRB"), and adopted a resolution, in which the MPRB agreed to drop its opposition to the South Tunnel Plan.  (Third Aff. of Joy R. Anderson ("Third Anderson Aff."), Exs. A & B, Mar. 16, 2015, Docket No. 71.)

Additionally, recent news reports indicate that the Met Council will subject the SWLRT to another round of municipal consent votes from Hennepin County, Minneapolis, St. Louis Park, Hopkins, Minnetonka, and Eden Prairie, due to the recent increase in the estimated cost of the project and the corresponding decision to cut $250 million from its budget.  Janet Moore,

(Footnote continued on next page.)

November 18, 2014 non-binding MOU with the Met Council. (Aff. of Jim Alexander ("Alexander Aff."), Ex. 9, Feb. 3, 2015, Docket No. 62.) That MOU contained the caveat that "no further study of the feasibility of rerouting freight traffic to the MN&S Route in St. Louis Park will be undertaken, except as required for any continuing environmental review of the SWLRT project." (Anderson Aff., Ex. 17 at 5.)

## IV. THE REMAINING STEPS IN THE ENVIRONMENTAL REVIEW PROCESS AND STATUS OF THE SWLRT

For months, the Met Council worked on the SDEIS, with plans to publish it in the second quarter of 2015. (Jacobson Aff. ¶ 31.) The record before the Court indicates that the SDEIS was slated to consider the South Tunnel Plan, in addition to other elements of the SWLRT. (*See id.* ¶ 32; *id.*, Ex. 16 at 129.) The Met Council's website indicates that on May 22, 2015, it released the SDEIS.[8]

After public input on the SDEIS has been received and further environmental analysis has been performed, the Met Council will complete and release its FEIS, likely in late 2015 or early 2016. (Anderson Aff., Ex. 2.) After the FEIS is completed, the Met Council will submit it to the FTA for its consideration, and the FTA will issue a ROD

---

(Footnote continued.)

*Transit déjà vu: Another round of public hearings set for Southwest light rail*, Star Tribune (July 23, 2015), http://www.startribune.com/transit-deja-vu-another-round-of-public-hearings-set-for-southwest-light-rail/318217091/

[8] *Supplemental Draft EIS*, Metropolitan Council, http://metrocouncil.org/Transportation/Projects/Current-Projects/Southwest-LRT/Environmental/SDEIS.aspx (last visited Aug. 3, 2015); Stephen Tellier, *Key Environmental Review of $2B Southwest LRT Project Released*, KSTP (May 22, 2015), http://kstp.com/article/stories/s3804074.shtml.

that provides environmental clearance.  (*Id.*, Ex. 4 at 10.)  The Met Council's current project timeline indicates that it expects a ROD in 2016.[9]  Heavy construction would occur between 2017 and 2019.  SWLRT passenger service is projected to begin in 2020.

## V.     THIS LITIGATION

The LPA filed this lawsuit on September 8, 2014 and filed an amended complaint on November 3, 2014.  (Am. Compl.)  The LPA filed a motion for summary judgment on the same date.  (Mot. for Summ. J., Nov. 3, 2014, Docket No. 13.)  The Court dismissed the LPA's claim against the FTA on March 6, 2015.  (Mem. Op. & Order, Mar. 6, 2015, Docket No. 69.)  On that same date, the Court dismissed the LPA's MEPA claim against the Met Council, while denying the motion to dismiss the LPA's NEPA and municipal consent statute claims against the LPA.  (*Id.*)

Relevant to this stage of the litigation, the LPA seeks declaratory and injunctive relief pursuant to NEPA and Minnesota Statute § 473.3993, *et seq.* ("Minnesota Light Rail Transit Statutes" or "municipal consent statutes").  (Am. Compl. ¶ 1.)  In Count I of the amended complaint, the LPA claims that the Met Council violated NEPA by proceeding with the municipal consent process on the SWLRT before the completion of a full environmental review.  (*Id*. ¶¶ 42-52.)  In Count III, the LPA alleges that the Met Council violated the state's municipal consent statutes by failing to provide a DEIS that analyzed the routes the cities voted on when giving municipal consent.  (*Id*. ¶¶ 63-69.)

---

[9]     *See Project Timeline*, Metropolitan Council ("*Project Timeline*"), http://www.metrocouncil.org/Transportation/Projects/Current-Projects/Southwest-LRT/Project-Facts/Timeline.aspx (last visited Aug. 3, 2015).

**DISCUSSION**

## I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U .S. 574, 587 (1986).  "It is within the court's power to grant summary judgment sua sponte against the moving party, lacking a cross-motion, where the party against whom the judgment is entered has had a full and fair opportunity to contest that there are no genuine issues of material fact to be tried and the party granted judgment is entitled to it as a matter of law."  *Burlington N. R.R. Co. v. Omaha Pub. Power Dist.*, 888 F.2d 1228, 1231 (8th Cir. 1989).


## II.   NEPA CLAIM

### A.    NEPA and the Narrow Cause of Action Recognized by this Court

As noted above, NEPA requires federal agencies to consider the environmental impacts and prepare an EIS for all "'major federal actions significantly affecting the quality of the human environment,'" and the SWLRT is a major federal action requiring

an EIS under NEPA. *Sierra Club v. U.S. Forest Serv.*, 46 F.3d at 837 (quoting 42 U.S.C. § 4332(2)(C)). NEPA serves the dual purposes of informing agency decision-makers of the environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA's mandate is "essentially procedural." *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action." *Robertson*, 490 U.S. at 351 (footnote omitted).

NEPA established the Council on Environmental Quality ("CEQ"), which has promulgated NEPA regulations. The LPA's NEPA claim is based on one such regulation: 40 C.F.R. § 1506.1. That regulation states that, "[u]ntil an agency issues a [ROD] . . . no action concerning the proposal shall be taken which would . . . [l]imit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a)(2); *see also id.* § 1502.5 (stating that an EIS "shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made"); *id.* § 1502.2(g) ("Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.").

Section 1506.1 also states, however, that it "does not preclude development by applicants of plans or designs or performance of other work necessary to support an

application for Federal, State or local permits or assistance." *Id.* § 1506.1(d); *see also id.* § 1500.2 (directing federal agencies to "[i]ntegrate the requirements of NEPA with other planning and environmental review procedures required by law . . . so that all such procedures run concurrently rather than consecutively"). In addition, federal regulations permit an agency to choose its preferred alternative and indicate as much in the DEIS. *Id.* § 1502.14(e) (noting that an EIS may "[i]dentify the agency's preferred alternative or alternatives").

Section 1506.1(a) allows the responsible agencies to take some preparatory steps toward completion of the project while the NEPA environmental review process is ongoing. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 145 (2010) ("Even if a particular agency proposal requires an EIS, applicable regulations allow the agency to take at least some action in furtherance of that proposal while the EIS is being prepared."). But NEPA does not allow for the relevant agency to "predetermine" – or "irreversibly and irretrievably commit[]" itself to – the route prior to completion of the environmental review process. *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10ᵗʰ Cir. 2010) ("A petitioner must meet a high standard to prove predetermination. We now make explicit what was implicit in our previous decisions: predetermination occurs only when an agency **irreversibly and irretrievably** commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, before the agency has completed that environmental analysis-which of course is supposed to involve an objective, good faith inquiry into the environmental consequences of the agency's proposed action." (emphasis added)).

NEPA generally does not authorize a cause of action, and judicial review is limited to a challenge to federal agency final action via the Administrative Procedure Act ("APA"). *See Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006). In its prior decision, however, the Court recognized a narrow cause of action against a state or local actor that is taking action, prior to the completion of federal environmental review, which may "'eviscerate the federal remedy.'" *LPA I*, 2015 WL 999945, at *13 n.13 (quoting *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 330-31 (4th Cir. 2008)). The analysis under that cause of action, pursuant to 40 C.F.R. § 1506.1(a), involves "an examination of whether state or local action will limit the alternatives considered during environmental review and thereby 'eviscerate' any chance of obtaining a federal remedy under NEPA and the APA, because the state or local actor will have taken action that will be impossible for a plaintiff to reverse by later suing a federal actor." *LPA I*, 2015 WL 999945, at *13 n.13.

### B.      Irreversible and Irretrievable Commitment

The critical question in this case, then, is whether the LPA has shown that the Met Council has "irreversibly and irretrievably" committed to a specific SWLRT route, *Forest Guardians*, 611 F.3d at 714, such that the pending federal environmental review is nothing more than "a '*fait accompli*'" and any attempt to obtain relief after the review is complete would be in vain, *Limehouse*, 549 F.3d at 331. *See also* 40 C.F.R. § 1506.1; *Nat'l Audubon Soc'y v. Navy*, 422 F.3d 174, 181 (4th Cir. 2005) ("The proper inquiry in a NEPA case is therefore not whether an agency has focused on its preferred alternative,

but instead whether it has gone too far in doing so, reaching the point where it actually has '[l]imit[ed] the choice of reasonable alternatives.' [40 C.F.R.] § 1506.1(a)(2).").

### 1. NEPA Violations

Although the LPA correctly pointed out at the hearing that there is no case directly on point, a number of cases that interpret and apply Section 1506.1 do provide helpful guidance here.[10]  Because this universe of cases is quite small and provides the most persuasive reasoning on how to resolve this case, the Court will recount these various cases in detail, and apply their holdings to this case below.

First, in a number of cases, courts have found a NEPA violation under Section 1506.1 (or under NEPA more broadly, pursuant to the principles embodied in Section 1506.1) and have considered, as a remedy, whether to allow additional project activity while further environmental review is pending.

In *National Audubon Society*, the Fourth Circuit concluded that the United States Navy's analysis in its EIS of an aircraft landing field was deficient under NEPA and that it must complete a supplemental EIS ("SEIS").  *Nat'l Audubon Soc'y*, 422 F.3d at 181. The court then considered what activity, if any, the Navy could take on the landing field prior to completing the SEIS, under Section 1506.1.  *Id.* at 200.  The court noted that "the

---

[10] Of course, these cases are not perfectly on point, in part because they involve a NEPA challenge, via the APA, against a federal actor.  Here, the LPA challenges a state actor, via the narrow cause of action recognized in this Court's prior Order and in *Limehouse*.  However, as discussed elsewhere, since the principles and analysis underlying Section 1506.1 and the *Limehouse* cause of action are similar, *see LPA I*, 2015 WL 999945, at *13 n.13, the cases have persuasive value.

question of whether particular activities will in fact '[l]imit the choice of reasonable alternatives,' 40 C.F.R. § 1506.1(a)(2), is context-specific." *Id.* at 202. The court distinguished between cases in which allowing any construction on a highway would have violated Section 1506.1, because it would have "virtually require[d] the agency to finish the project regardless of what that analysis revealed," and cases involving only "de minimis construction," like "surveying and unrelated construction," that would not violate the regulation. *Id.* (quoting *North Carolina v. City of Va. Beach*, 951 F.2d 596, 603 (4th Cir. 1991)). The court then concluded that the district court had erred in issuing a sweeping injunction that barred all construction on the landing field. *Id.* at 202. The court determined that the Navy could move forward on selective activities, such as conducting more extensive studies of the preferred site, acquiring land, purchasing land, conducting architectural and engineering work, and applying for permits. *Id.* at 204-06. The court reasoned that these activities would not create such a "'bureaucratic steamroller'" that they would "pre-commit" the Navy to a certain site, noting that the Navy could lease or resell the land it acquires, if it chooses a different site following the SEIS. *Id.* at 206; *see also Tenn. Envtl. Council v. Tenn. Valley Auth.*, 32 F. Supp. 3d 876, 884-85 (E.D. Tenn. 2014) (concluding that no irreversible or irretrievable commitment existed under Section 1506.1 where the defendant had entered into a series of contracts, but those contracts "committed defendant only to the initial design and engineering work that was necessary to defendant's adequate performance of the environmental review process").

In *Davis v. Mineta*, 302 F.3d 1104, 1109-1110, 1126 (10th Cir. 2002), the court reversed a district court's decision not to grant a preliminary injunction barring construction on a project. The court determined that the Federal Highway Administration's ("FHWA") issuance of an Environmental Assessment ("EA") and corresponding Finding of No Significant Impact ("FONSI") (alleviating the need to produce a detailed EIS) violated NEPA, in large part because the FHWA prejudged whether a FONSI should be issued. *Id.* at 1112-13. The FHWA was intimately involved with the NEPA process – a process that involved an agreement between a contractor and the relevant city that obligated the contractor to prepare a FONSI by a certain date. *Id.* at 1112 ("The decision whether to prepare a FONSI should be based on the EA, of course, not the other way around."). The court enjoined construction on the road project – even construction on the early parts of the project – until further environmental review was completed, because any construction would present a "serious risk . . . that the analysis of alternatives required by NEPA will be skewed toward completion of the entire Project." *Id.* at 1114-15 & n.7, 1126 (noting "[t]he difficulty of stopping a bureaucratic steam roller, once started" (internal quotation marks omitted)); *see also Save the Yaak Comm. v. Block*, 840 F.2d 714, 718, 722 (9th Cir. 1988) (finding a NEPA violation where road construction contracts – tied to timber sales – were awarded "prior to preparation of the EAs" and consequently enjoining future construction until further analysis could be completed).

In *Burkholder v. Peters*, 58 F. App'x 94, 97-98 (6th Cir. 2003), the Sixth Circuit concluded that the Ohio Department of Transportation violated Section 1506.1 when it

signed a contract for final design work "over three years before completion of the EA and the FONSI." Despite that violation, however, the court adopted an "oversight test" employed by the Tenth Circuit, and decided that independent oversight by the relevant federal agency (the FHWA) cured the regulatory violations. *Id.* at 98-101. The court reasoned that the FHWA had committed no funds to the project prior to the completion of the EA and was entitled to a presumption of regularity. *Id.* at 100. The court rejected the claim that the FHWA was biased against the plaintiffs' preferred alternatives, declining to judge the substantive nature of the FHWA's decisions under NEPA, which only requires certain procedures. *Id.* at 100-02.

In *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000), the Ninth Circuit found a NEPA violation where the National Oceanic and Atmospheric Administration ("NOAA") entered a written agreement with the Makah Indian Tribe, committing itself to seeking permission for the tribe to conduct a whale hunt from the International Whaling Commission ("IWC"), prior to the completion of an EA. The court noted that, far from engaging in the NEPA process at the earliest possible time, NOAA "did not even consider the potential environmental effects of the proposed action until long after they had already committed in writing to support the Makah whaling proposal." *Id.* If the EA had indicated the need for an EIS, NOAA would likely not have been able to honor its agreement to support a proposal to the IWC, which would have left the agency – and the federal government – in breach of contract. *Id.* at 1144. The court concluded that, prior to environmental review, "the die already had been cast," even though the federal government ultimately ended up pulling its support for the Makah's IWC proposal

anyway. *Id.* ("Although the United States delegates to the 1996 IWC meeting ultimately withdrew their proposal for a Makah aboriginal subsistence whaling quota, they did so with the Tribe's approval and because the proposal did not have adequate support from other IWC delegations, **not** in order to reconsider environmental concerns."); *see also id.* ("It is highly likely that because of the Federal Defendants' prior written commitment to the Makah and concrete efforts on their behalf, the EA was slanted in favor of finding that the Makah whaling proposal would not significantly affect the environment."). The court ordered the preparation of a new EA, and suspended the agreement with the Makah in the interim. *Id.* at 1146 (ordering the new EA, but expressing some concern that the conclusion would still be foregone, amounting to "a classic Wonderland case of first-the-verdict, then-the-trial"); *see also Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 229-30 (D.D.C. 2003) (concluding that the U.S. Fish and Wildlife Service violated NEPA when it issued permits to kill mute swans, prior to completion of an EA; although the permits could be revoked, some swans were undoubtedly killed in the interim, making the issuance of permits an "irreversible and irretrievable commitment of resources" (internal quotation marks omitted)).

Lastly, in *Conner v. Buford*, 848 F.2d 1441, 1447-51 (9th Cir. 1988), the Ninth Circuit distinguished two different types of leases, focusing on whether each lease actually committed the government to allowing surface disturbing activity. No Surface Occupancy ("NSO") leases, which required further government approval before allowing surface-disturbing activity, did not violate NEPA even if entered into prior to an EIS. *Id.*

On the contrary, leases without the NSO prior-approval requirement, if signed before an EIS, did violate NEPA.  *Id.*

### 2.      No NEPA Violations

In still other related cases, courts found no NEPA violations.  In *Hawaii County Green Party v. Clinton*, 124 F. Supp. 2d 1173, 1195-98 (D. Haw. 2000), the court concluded that the Navy's expenditure of some $350 million on research and development of advanced sonar technology, prior to the completion of an EA to determine the technology's effect on whales, was not so irreversible and irretrievable that it constituted final agency action.  The court reasoned that research and development was necessary and that the work for which the Navy had already contracted could be used regardless of whether the Navy deployed the sonar technology.  *Id.* at 1196-97. Distinguishing the case from *Metcalf* and *Save the Yaak*, the court stated that those cases involved contracts that bound "the government to take certain positions before an EA was done evaluating **those positions**."  *Id.* (emphasis added).  In contrast, in *Hawaii County Green Party*, "the fact that the government [had] bound itself to pay its ship builders," did not "equate to the government binding itself to deploy" the sonar technology at issue. *Id.* at 1197-98; *see also Cent. Delta Water Agency v. U.S. Fish & Wildlife Serv.*, 653 F. Supp. 2d 1066, 1090-93 (E.D. Cal. 2009).

Finally, in *Forest Guardians*, the court distinguished impermissible "predetermination" from "mere subjective impartiality," in considering a challenge under NEPA to a rule regarding the release of captive-bred falcons.  611 F.3d at 700-01, 714

(internal quotation marks omitted). It noted that "subjective impartiality may under certain circumstances involve something resembling predetermination and lead an agency down the road to predetermination." *Id.* at 714. But it reiterated that a plaintiff faces a high hurdle to show that an agency irreversibly and irretrievably committed its resources to a certain course of action, prior to the completion of NEPA review. *Id.* at 715. The court then concluded that the conduct at issue – internal communication expressing a preference for one preferred alternative and a grant agreement with a non-profit entity – did not amount to predetermination on the part of the U.S. Fish and Wildlife Service. *Id.* at 718-19. The communication – even emails stating that the rule at issue was a "done deal" – merely amounted to expressing a preference. *Id.* at 718 & n.20. The grant agreement did not bind the government to a certain type of rule prior to environmental review; instead, it was limited to certain activities and could be expanded if the rule were promulgated. *Id.* at 718-19.

### 3. This Case

The Court concludes that the LPA has not shown that it is entitled to summary judgment. Although the parties appear to agree that the facts at this stage are undisputed, the LPA has not shown, based on the facts currently available, that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). At the motion to dismiss stage, taking into account and accepting as true the LPA's factual allegations in the complaint, the LPA demonstrated a plausible claim that the Met Council had – through the municipal consent process – gone "beyond the simple selection of a preferred

alternative," leaving "little practical likelihood that any other route [would] be selected." *LPA I*, 2015 WL 999945, at *18. But at the summary judgment stage, in which the Court applies a different standard, and with the benefit of more record evidence and summary judgment briefing and arguments, the Court concludes that the LPA has not yet shown that the Met Council's actions have irreversibly and irretrievably committed to a specific SWLRT route.

Several facts are critical. First, the municipal consent process is not binding. (*See* Alexander Aff. ¶ 6.) Changes can be made to the project after initial approval under the municipal consent process that would require the Met Council to obtain new approval. *See* Minn. Stat. § 473.3994, subd. 5. Indeed, in the case of the Hiawatha Light Rail Transit Line, the city of Bloomington initially approved the project, but then approved changes on two subsequent occasions. (Fuhrmann Aff., Ex. 2; *id.*, Ex. 3.) Of course, the effect of multiple municipal agreements, reached through extensive negotiations, and announced by local politicians with great fanfare, may amount to a sort of "bureaucratic steamroller" that, in all practicality, makes the plan chosen through municipal consent a foregone conclusion. That is especially true when the portions of the route subject to debate and change, as in this case, are highly controversial. As a result, unlike in the Bloomington examples, the South Tunnel Deal may be less likely to change. Nevertheless, the Court cannot ignore the significant fact that the municipal consent process is non-binding.

Second, it is important to note that the MOUs signed with St. Louis Park and Minneapolis, while again likely to generate political pressure for a certain result, are also

non-binding and do not unequivocally force the Met Council or the FTA to select a specific route. (*See* Alexander Aff., Ex. 9; *id.*, Ex. 6.) Similarly, even if the MPRB MOU is binding, it clearly states that "[n]othing in this MOU shall require the Metropolitan Council or the MPRB to take any action or make any decision that will prejudice or compromise any processes required under state or federal environmental or other laws or regulations." (Third Aff. of Joy R. Anderson ("Third Anderson Aff."), Ex. A at 2, Mar. 16, 2015, Docket No. 71.)

Third, it is relevant that the FTA, the federal actor in this case ultimately responsible for issuing a ROD based on the FEIS and approving federal participation in and funding for the project, has not yet made a determination regarding the project and is not legally bound by the municipal consent process. (Decl. of Maya Sarna ¶¶ 10-14, Nov. 17, 2014, Docket No. 33); *see Burkholder*, 58 F. App'x 94 at 98-102 (holding that a state agency violated NEPA by signing final design contracts before federal environmental review was complete, but concluding that independent federal agency approval cleared away the taint of the violation). *But see Limehouse*, 549 F.3d at 330-31 (recognizing a cause of action against a state actor who might begin construction, prior to reconsideration of the FEIS, despite the fact that independent federal review would occur and despite the assurances of the state actor that no construction would begin absent federal approval).

All of these factors bring this case in line with some of the cases cited above. Like the NSO leases in *Conner*, 848 F.2d at 1447-51, for example, the municipal consent process and MOUs signed in this case still leave both the Met Council and the FTA room

to back out and adopt a different route. Similarly, like the land acquisition and permitting activities in *National Audubon Society*, 422 F.3d at 202-06, the Met Council's activities may express a preference for a certain route, but they do not unequivocally "pre-commit" either the Met Council or the FTA to that route, with no way to reverse course and put the work the agencies have done to use for a different approach. While the MOUs and municipal consent process may appear to go farther than the grant agreement in *Forest Guardians*, 611 F.3d at 718-19, they are similarly structured in that they do not bind the agencies to a particular result and concede that environmental review may lead to a different approach. Moreover, the agreements here are distinguishable from the binding agreements, requiring a certain outcome, in cases like *Davis*, 302 F.3d at 1112-15; *Save the Yaak*, 840 F.2d at 718, 722; and *Fund for Animals*, 281 F. Supp. 2d at 229-30. The agreement in *Metcalf*, 214 F.3d at 1143-46, which did violate NEPA, is a bit closer because it only obligated the NOAA to advocate for a whale hunt to a different agency, and because it was deemed binding despite the U.S. delegation ultimately pulling support for the proposal. Nevertheless, the *Metcalf* agreement was still more binding than in this case, because none of the agreements in this case would leave the Met Council or FTA in breach of contract if they ultimately adopted a different approach.

Although all of the relevant case law argues for denying the LPA's motion for summary judgment, the LPA notes that there is no case quite like this one, where a robust and highly publicized state-authorized municipal consent process precedes federal review. The LPA is correct and the Court is still concerned, given the statements of political and Met Council leaders throughout the municipal consent process, (*see* Second

Aff. of Joy R. Anderson ("Second Anderson Aff."), Ex. A, Feb. 24, 2015, Docket No. 64), and the language of the Council's agreement with St. Louis Park – which though technically non-binding, certainly seems to all but guarantee that freight rail will stay out of the community, that a political and bureaucratic drumbeat has begun that will lead inexorably to exactly the choice the Met Council wants. In other words, the Court remains concerned that the Met Council has done more than express a preferred alternative, and has "gone too far" and has effectively committed itself to a specific route. *Nat'l Audubon Soc'y*, 422 F.3d at 181.

Still, despite those concerns, the LPA has not shown, on the facts available at this point and in light of the persuasive authority discussed above, that it is entitled to judgment as a matter of law. Indeed, even in *Limehouse*, the plaintiff alleged that construction was imminent, 549 F.3d at 330-31, whereas here all parties agree that many more steps in the process lie ahead. Indeed, compelling evidence exists – evidence that is not part of the record, but that is similar to much of the evidence already submitted by the LPA – that in recent months, due to increases in the project's projected cost, the Met Council has cut portions of the SWLRT route and intends to subject the project to the municipal consent process yet again. *See supra* notes 2, 7. In sum, summary judgment for the LPA would be premature at this point. Because additional facts and environmental analysis are forthcoming, the Court will decline to grant summary judgment sua sponte to the Met Council. (*See* Met Council Mem. Opposing Mot. for Summ. J. at 33, Feb. 3, 2015, Docket No. 59 (requesting that the Court grant summary judgment for the Met Council).) The Court anticipates that at the appropriate time, when

the record is more adequately developed, the Court will once again consider summary judgment.

## III.    MUNICIPAL CONSENT STATUTES

The parties also dispute whether the Met Council has violated the state's municipal consent statutes by not providing the six municipalities with a DEIS that analyzed the Tunnel plan or South Tunnel Plan before obtaining their consent votes. The Met Council concedes that Minnesota Statute § 473.3994, subd. 3 (emphasis added), requires a city to have access to "**the physical design component** of the preliminary design plans" before voting on a project, and that "preliminary design plans" include a full DEIS, Minn. Stat. § 473.3993, subd. 2. Nevertheless, the Council argues that "the physical design component" is all that is required of "preliminary design plans" prior to a vote, and that the "physical design component" is more limited than the full DEIS.

The municipal consent statutes do not explicitly define "physical design component." But the statutes do define "preliminary design plans." The parties agree that a "preliminary design plan" includes three components. First, there are the "preliminary plans for the physical design of facilities," which includes "location, length, and termini of routes; general dimension, elevation, alignment, and character of routes and crossings; whether the track is elevated, on the surface, or below ground." Minn. Stat. § 473.3993, subd. 2(1). Second, there are the "preliminary plans for intermodal coordination": "bus operations and routes; ridership; capital costs; operating costs and revenues, and sources of funds for operating subsidies; funding for final design,

construction, and operation; and an implementation method." Minn. Stat. § 473.3993, subd. 2(2). Finally, the statute states that the "preliminary design plan includes the" DEIS. Minn. Stat. § 473.3993, subd. 2.

Because the "preliminary plans for the physical design of facilities" portion of the definition, which the Met Council argues is synonymous with the "physical design component," is separate from the DEIS portion of the definition, Minn. Stat. 473.3993, subd. 2, and because nothing more than the "physical design component" is required prior to a municipal consent vote, Minn. Stat. § 473.3994, subd. 3, the Met Council contends that no DEIS was needed prior to the municipal consent votes.

The Met Council also distinguishes the "preliminary design plan" from the "preliminary engineering plan," which "means a light rail transit plan that includes the items in the preliminary design plan for the facilities proposed for construction, but with greater detail and specificity to satisfy final environmental impact statement requirements." Minn. Stat. § 473.3993, subd. 2a. Since the "preliminary engineering plan" definition explicitly states that it must contain the information needed to meet the requirements of an FEIS, the Met Council argues that the legislature knew how to create an explicit requirement that EIS information be contained in a plan. Because they did not do so explicitly in the "physical design" of "preliminary design plan" definition, Minn. Stat. § 473.3993, subd. 2(1), and because they stated that a city only needs access to the "physical design component of the preliminary design plan" before a vote, Minn. Stat. §473.3994, subd. 3, the legislature must not have wanted to require that EIS information be available to cities prior to the municipal consent vote.

Certainly other interpretations of this statutory scheme are possible, *see LPA I*, 2015 WL 999945, at *20, but the Met Council's view is the most reasonable interpretation of the municipal consent statutes. While the LPA is correct that providing municipalities with a DEIS prior to a municipal consent vote would provide them with more needed and important information regarding the light rail project they are approving, the Court will not read into a state statutory scheme a requirement that appears to contravene the clear text of the provision. In sum, the Court will not grant the LPA's motion for summary judgment on its municipal consent statute claims.

## CONCLUSION

This opinion concludes that the LPA has not shown it is entitled to judgment as a matter of law on the record before the Court. It does not, however, end the case. This action involves complex legal issues and an evolving factual record. The theme underlying these complexities, though, and underlying the cause of action recognized in this Court's prior Order, in *Limehouse*, and in environmental regulations like Section 1506.1, is that full and thorough environmental review of a major government project is vitally important. The LPA may not have met its summary judgment burden at this point, but the record – specifically the negotiation process and agreements between the Met Council and various cities and other public entities, and public statements regarding those agreements – shows that, throughout much of this process, the Met Council has had a clear favorite route for the SWLRT. While the agency in charge can state a subjective preference, the unique nature of the municipal consent process in Minnesota for light rail

projects, and the significant drumbeat of support the Met Council assembled for a single route, certainly comes close to having the practical effect of limiting the available options, such that the remaining federal environmental review is meaningless. Indeed, by signing an agreement with St. Louis Park that all but guarantees freight rail will stay in the Kenilworth Corridor, the Met Council has come dangerously close to impermissibly prejudicing the ongoing environmental review process. Given the importance of a searching environmental analysis of each of the available options, the remaining steps in the process of securing municipal consent and finalizing environmental review – by both the Met Council and the FTA – should provide that searching analysis in order to comply with NEPA's twin aims of informing decisionmakers and involving the public.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that the LPA's Motion for Summary Judgment[11] [Docket No. 13] is **DENIED**.

DATED:  August 4, 2015
at Minneapolis, Minnesota.

_s/ John N. Tunheim_
JOHN R. TUNHEIM
Chief Judge
United States District Court

---

[11] The Court's prior Order [Docket No. 69] dismissed the LPA's sole claim against the Federal Transit Administration (FTA), without prejudice. The FTA was consequently terminated from the case.