## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| LAKES AND PARKS ALLIANCE OF MINNEAPOLIS, | Civil No. 14-3391 (JRT/SER) |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| THE METROPOLITAN COUNCIL, | |
| Defendant. | |

Lewis A. Remele, Jr., **BASSFORD REMELE**, 100 South Fifth Street, Suite 1500, Minneapolis, MN 55402, Joy R. Anderson and Thomas L. Johnson, **GRAY PLANT MOOTY**, 80 South Eighth Street, Suite 500, Minneapolis, MN 55402, for plaintiff.

Charles N. Nauen and David J. Zoll, **LOCKRIDGE GRINDAL NAUEN PLLP**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401, and Ann K. Bloodhart, **METROPOLITAN COUNCIL, OFFICE OF GENERAL COUNSEL**, 390 Robert Street North, Saint Paul, MN 55101, for defendant.

### INTRODUCTION

This is the third chapter of this continuing dispute between a group of Minneapolis residents and the Twin Cities regional policymaking and planning agency concerning a $1.8 billion light-rail project – reputed to be the largest public-works project in the state's history.

In the first chapter, the Lakes and Parks Alliance of Minneapolis ("LPA") brought claims against the Metropolitan Council and the Federal Transit Administration ("FTA") alleging violations of state and federal law, including the National Environmental

- 1 -

Protection Act ("NEPA").  The Court dismissed all the claims in the LPA's action except a single cause of action under a federal environmental regulation against the Council.

In the second chapter, the Court denied LPA's motion for summary judgment. The LPA argued that the Council had violated a NEPA regulation because the Council completed the federally mandated environmental review after engaging in municipal consent – a state-mandated process of securing prior approval from all county and municipal governments through which a proposed light-rail project will run.  The Court concluded that the LPA had not shown that it was entitled to summary judgment on the record at that time, but noted that the Council appeared to have come close to violating federal law by predetermining the route before all alternatives could be properly reviewed.

Now, in the third chapter, the Court considers the second round of summary-judgment motions.  The LPA renews its motion after taking discovery and after the Council completed the environmental review.   The LPA argues that the Council committed itself to a specific light-rail route before completing the final environmental review and that the Council's actions concerning that decision amounted to an irreversible and irretrievable predetermination of a particular light-rail route in violation of federal law.  The Council cross-moves for summary judgment, arguing that it did not irreversibly and irretrievably commit itself to a specific light-rail route as a result of the municipal-consent process.

This is a close case.  State law, while well intentioned, severely restricts the Council's ability to move light-rail projects forward during the planning and design

phases because the state's municipal-consent regime effectively gives veto power to every local government along the project's proposed route.  At the same time, and in potential conflict, federal law requires the Council not to limit reasonable alternatives until the final environmental review is complete.  For the Council, walking that tightrope is difficult.  The Court's task here, however, is not to consider the wisdom of the Council's decisions and deals, but rather, is limited to deciding whether the Council violated federal law.  Because the Court will find that the Council did not irreversibly and irretrievably commit itself to a specific light-rail route, despite giving the appearance that it did, the Court will deny the LPA's motion, grant the Council's motion, and enter judgment for the Council.

## BACKGROUND[1]

### I.    OVERVIEW AND LEGAL BACKDROP

The Council is leading the effort to build a new light-rail line that connects downtown Minneapolis with the southwestern Twin Cities suburbs ("SWLRT").  *LPA I*, 91 F. Supp. 3d at 1111.  The SWLRT's proposed route goes through the Kenilworth Corridor – a one-and-a-half mile strip of land in Minneapolis.  *Id.*   The Corridor presently contains a freight-rail line and a biking/running path.  *Id.*  The final proposed

---

[1] The Court articulated the factual background of this case in detail in its prior Orders. *Lakes & Parks All. of Minneapolis v. FTA* (*LPA I*), 91 F. Supp. 3d 1105, 1111-16 (D. Minn. 2015); *Lakes & Parks All. of Minneapolis v. Metro. Council* (*LPA II*), 120 F. Supp. 3d 959, 962-67 (D. Minn. 2015).  The Court will recount relevant facts here, drawing on the description found in those decisions and the additional materials provided with the summary-judgment briefs.

route keeps freight traffic in the Corridor at grade, and has the SWLRT travel in a tunnel through the southern half of the Corridor and at grade through the northern half (the "South Tunnel Plan").  *Id.* at 1114.

"Municipal consent" is required for light-rail projects by Minnesota Statute § 473.3994, which states that each city and county in which a light-rail-transit route is proposed to be located must hold a public hearing and vote to approve or disapprove the physical design component of the preliminary design plans for the project.  Minn. Stat. § 473.3994, subds. 2-3.  The Council is empowered to mediate and resolve disputes about the plans, and the Council must consider a disapproving entity's proposed amendments to the plans before continuing the planning and design phases of the light-rail project.  *Id.*[2]

Federal law, specifically NEPA, requires federal agencies to consider the environmental impacts of and prepare an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." *Sierra Club v. U.S. Forest Serv.*, 46 F.3d 835, 837 (8th Cir. 1995) (quoting 42 U.S.C. § 4332(2)(C)).  Because the FTA – a federal agency – will partially fund the SWLRT project,  the project is a major governmental action that requires preparation of an EIS pursuant to NEPA.  *LPA II*, 120 F. Supp. 3d at 963.

---

[2] Neither party has argued that Minnesota's municipal-consent law conflicts with or is preempted by federal law or regulations.

## II.    BUILD-UP TO THE SOUTH TUNNEL PLAN

In 2009, the Hennepin County Regional Railroad Authority ("HCRRA") issued the Scoping Summary Report, the first step in the environmental-review process. *LPA I*, 91 F. Supp. 3d at 1112.   That Report did not include any analysis of tunnels in the Corridor.  *Id.*  In October 2012, the HCRRA issued the Draft Environmental Impact Statement ("DEIS"), the next step in the process.  The DEIS also did not include any analysis of tunnels in the Corridor.  *Id.* at 1112-13.  Rather, the DEIS evaluated three strategies for the Corridor: (1) (the preferred strategy) reroute freight rail through St. Louis Park and locate the SWLRT at grade in the Corridor, (2) reroute freight rail through St. Louis Park and locate the SWLRT outside the Corridor, or (3) co-locate freight rail and the SWLRT at grade in the Corridor.  *Id.*  The DEIS concluded that strategy (3) – co-location at grade – would not adequately preserve the environment in the Corridor.  *Id.* at 1113.

The FTA and U.S. Army Corps of Engineers, however, determined that the first strategy (relocation) was not technically feasible because the rerouting of freight-rail traffic might, among other things, endanger aquatic resources.  *LPA II*, 120 F. Supp. 3d at 965.  They suggested that routing the SWLRT through tunnels in the Corridor might alleviate the environmental concerns associated with routing the SWLRT through the Corridor at grade raised in the DEIS.  *Id.*  Additionally, St. Louis Park opposed the prospect of relocated freight-rail traffic through its city.  *Id.* at 964-66.  Its city manager stated that St. Louis Park would likely not support freight-rail relocation in the municipal-consent process.  (Aff. of Joy R. Anderson ("Anderson Aff.") ¶ 6, Ex. 5 at 2-3, Apr. 28,

2017, Docket No. 135.)  In July 2013, the Council and FTA announced that they would issue a Supplemental DEIS ("SDEIS"), the scope of which would include "freight rail alignments" and which would evaluate the environmental impacts of proposed routes not included in the DEIS.  *LPA II*, 120 F. Supp. 3d at 965.

In late 2013, the Council began to advocate for a plan that included locating the SWLRT in the Corridor but in one or more tunnels, and keeping the existing freight rail in the Corridor at grade along with the biking/running path.  For example, the Council's then-chair, Susan Haigh, emailed Governor Mark Dayton in August 2013, stating that routing the SWLRT outside of the Corridor had already been "rejected" as the local-government alternative, and that routing the SWLRT in the Corridor was the local-government "consensus."  (Anderson Aff. ¶ 9, Ex. 8.)  A few days later, Minneapolis Mayor R.T. Rybak wrote a letter to Haigh, stating that Minneapolis "only agreed to support placing [SWLRT] on the Kenilworth Corridor on condition that [Hennepin] County's promise to not allow co-location with freight would be fulfilled," and that Minneapolis "need[s] a rock solid guarantee" that co-location at grade "will not happen." (*Id.* ¶ 7, Ex. 6 at 2.)  When freight rail was first located in the Corridor several years ago, it was intended to be a temporary situation (*id.* ¶ 20, Ex. 19 at 10-11), so Minneapolis objected when the Council indicated that freight-rail traffic would not be rerouted as part of the SWLRT Project.

On October 2, 2013, Council staff recommended routing the SWLRT through two shallow tunnels in the Corridor and keeping freight-rail traffic in the Corridor.  (*Id.* ¶ 11, Ex. 10 at 2.)  In an email to Haigh on October 6, 2013, Council member Adam Duininck

stated, "From the first briefing I received on SWLRT, it was overwhelmingly clear where the staff recommendation was headed" with respect to relocating freight-rail traffic, and "[t]hat sense of it being a foregone conclusion is the primary driver of why Minneapolis believes that the process has not been fair." (*Id.* ¶ 13, Ex. 12 at 1.)

In late 2013, at Governor Dayton's request, the Council hired TransSystems, a transportation-engineering firm, to independently analyze options for freight-rail relocation. (*Id.* ¶¶ 16-20, Exs. 15-19.) TransSystems concluded that only two viable options existed for freight-rail traffic: through the Corridor, or through St. Louis Park via tracks that Twin Cities & Western Railroad Company ("TC&W") operates. (*Id.* ¶ 20, Ex. 19 at 34.) In March 2014, TC&W notified the Council that rerouting freight-rail traffic through St. Louis Park would present physical and engineering obstacles that would create a risk of train derailment – a risk that TC&W could not mitigate. (Aff. of Charles N. Nauen ("Nauen Aff.") ¶ 7, Ex. 7, May 19, 2017, Docket No. 141.)

In April 2014, the Council put the two-tunnel plan up for municipal consent. *LPA II*, 120 F. Supp. 3d at 965-66. While awaiting municipal consent, the Council entered into two Memoranda of Understanding ("MOU") – one with Minneapolis and one with St. Louis Park. *LPA I*, 91 F. Supp. 3d at 1113-14. The Minneapolis MOU states, among other things, that freight rail will remain in the Corridor and that the SWLRT route will travel the southern portion of the Corridor in a tunnel and the northern portion at grade – the South Tunnel Plan. *LPA II*, 120 F. Supp. 3d at 965-66. The Council also agreed to add a stop on the SWLRT route at 21st Street in the Corridor – a stop that Minneapolis

wanted added.  (Anderson Aff. ¶¶ 30-31, Exs. 29-30.)[3]  The St. Louis Park MOU states that "no further study of the feasibility of rerouting freight traffic [through] St. Louis Park will be undertaken, except as required for any continuing environmental review."  (*Id.* ¶ 34, Ex. 33.)  In August 2014, the municipalities approved the two-tunnel plan via the municipal-consent process, with Minneapolis voting specifically on the South Tunnel Plan.  *LPA II*, 120 F. Supp. 3d at 966.

## III.  FINAL ENVIRONMENTAL REVIEW

In May 2015, the Council issued the SDEIS, which addressed alternatives and potential impacts that were not fully evaluated in the DEIS, including the South Tunnel Plan.  (Nauen Aff. ¶ 16, Ex. 16.)  The SDEIS concluded that the South Tunnel Plan provided the best balance of costs, benefits, and environmental impacts.  (*Id.*)  Later that fall, the Council put a revised plan – which included the South Tunnel Plan along with other cost-saving modifications and changes to the physical design – up for a second round of municipal consent, which it received.[4]

The Council and FTA issued the Final Environmental Impact Statement ("FEIS") in May 2016.  (*Id.* ¶ 22, Ex. 22.)  The alternatives it evaluates are the South Tunnel Plan and a No-Build alternative.  (*Id.*)  The FTA issued its Record Of Decision ("ROD") in

---

[3] After this litigation commenced and the Council argued to the Court that the MOUs were nonbinding, Minneapolis Mayor Betsy Hodges made clear to the Council that Minneapolis considers its MOU binding.  (Anderson Aff. ¶ 32, Ex. 31.)

[4] Metropolitan Council, *Municipal Consent, Local Review of Preliminary Design Plans*, https://metrocouncil.org/Transportation/Projects/Current-Projects/Southwest-LRT/Engineering/ Municipal-Consent.aspx (last visited Oct. 25, 2017).

July 2016, concluding that NEPA's requirements had been satisfied.  (*Id.* ¶ 19, Ex. 19.)
And in August 2016, the Council determined that the FEIS was adequate – allowing the
SWLRT project finally to move forward.  (*Id.* ¶ 21, Ex. 21.)

## IV.    PROCEDURAL BACKGROUND

The LPA brought this action in September 2014, shortly after the Council
completed the first round of municipal consent.  (Compl., Sept. 8, 2014, Docket No. 1.)
The LPA filed a motion for summary judgment shortly thereafter.  (Pl.'s First Mot.
Summ. J., Nov. 3, 2014, Docket No. 13.)  The Council then filed a motion to dismiss.
(Def.'s Mot. Dismiss, Nov. 17, 2014, Docket No. 36.)

In March 2015, the Court denied the Council's motion to dismiss, finding that the
LPA has a narrow cause of action against the Council arising under a federal regulation
enacted pursuant to NEPA.  *LPA I*, 91 F. Supp. 3d at 1120-32.  In August 2015, the Court
denied the LPA's motion for summary judgment, finding that the factual record at that
time did not support summary judgment for the LPA.  *LPA II*, 120 F. Supp. 3d at 975-
76.[5]  Since then, the parties have completed discovery, the Council and FTA have
completed the environmental-review process, and the FTA has issued its ROD.

The LPA now renews its motion for summary judgment.  The LPA argues that the
Council's completion of the municipal-consent process was an irreversible and
irretrievable commitment to a particular SWLRT route before the FTA issued its ROD.

---

[5] The only claim that remains in this case is the LPA's NEPA claim against the Council.
*See LPA II*, 120 F. Supp. 3d at 961-62.

The LPA asks the Court to declare that the Council violated NEPA, declare the entire environmental-review process null and void, and enjoin the Council from any further work on the SWLRT until the Council completes a new environmental-review process that complies with NEPA and its regulations.  (Pl.'s Mem. Supp. Second Mot. Summ. J. at 32, Apr. 28, 2017, Docket No. 134.)[6]  The Council cross-moves for summary judgment, arguing that it did not make an irreversible and irretrievable commitment to a particular SWLRT route before the completion of the environment review.

Because the Court will conclude that there is no genuine dispute of material fact that the Council did not irreversibly and irretrievably predetermine the SWLRT route, the Court will grant the Council's motion for summary judgment, deny the LPA's motion for summary judgment, and enter judgment for the Council.

## DISCUSSION

## I.     STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

---

[6] The scope of the LPA's current request for injunctive relief is broader than that in its first motion for summary judgment in which the LPA merely asked the Court to declare the municipal-consent process null and void.  (*See* Pl.'s Mem. Supp. First Mot. Summ. J. at 26, Nov. 3, 2014, Docket No. 15.)

court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009).

## II.      LPA'S NEPA CLAIM

### A.      LPA's NEPA Claim Previously Recognized

A federal regulation adopted pursuant to NEPA provides that "[u]ntil an agency issues a record of decision . . . , no action concerning the proposal shall be taken which would: . . . [l]imit the choice of reasonable alternatives." 40 C.F.R. § 1506.1. That regulation allows the responsible agencies to take some preparatory steps toward completion of the project while the NEPA environmental-review process is ongoing. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 145 (2010). But an agency may not "predetermine" – or "irreversibly and irretrievably commit[]" itself to – a specific route prior to completion of the environmental-review process. *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010).

The Court previously recognized the LPA's cause of action under 40 C.F.R. § 1506.1.

> "Because state actors could significantly alter a project's environmental impact, a federal court may hear a suit for injunctive relief.  Were it otherwise, state action could render a NEPA violation a '*fait accompli*' and eviscerate the federal remedy."
>
> . . .
>
> [T]he LPA has certainly provided sufficient allegations . . . to show that the Met Council's actions pursuant to the municipal consent process could dramatically alter or reduce, or change the cost of, the alternatives available to the FTA during its environmental review.
>
> . . .
>
> [T]he Court . . . recognizes in this case a similar, limited, narrow cause of action against the Met Council.  This cause of action is not a broad one under NEPA.  Instead, it is tied to the regulation under which it was brought, 40 C.F.R. § 1506.1(a), and the particular facts of this case: a massive public transit project which faces a robust municipal consent process under state law that generates political support and approval for a specific route and may effectively limit and alter the choices available during the remaining stages of the environmental review for this project.
>
> . . .
>
> The LPA's claim arises under 40 C.F.R. § 1506.1(a); specifically, the provision that bars any action, prior to the issuance of an ROD, that would "[l]imit the choice of reasonable alternatives" for a proposal.  This rule, and the cause of action . . . require roughly the same inquiry from the Court: an examination of whether state or local action will limit the alternatives considered during environmental review . . . .  As a result, in recognizing a limited NEPA cause of action against the Met Council . . . , the Court will consider the LPA's substantive allegations brought under Section 1506.1(a).
>
> . . .
>
> Given the particular circumstances of this case, this Court cannot imagine that Congress would intend for a major transit project to escape full and thorough NEPA review because – despite the unique scope of the consent process required under state law for local governments – NEPA offered no

> cause of action against a state actor working in tandem with
> the federal government and taking significant action prior to
> the completion of the environmental review process.

*LPA I*, 91 F. Supp. 3d at 1122-25 & ns.12 & 13 (citations omitted).

## B.  Irreversible and Irretrievable Commitment

The parties do not dispute the factual events that took place.  Rather, they dispute whether the Council's actions constituted predetermination in violation of federal law. "A petitioner must meet a high standard to prove predetermination."  *Forest Guardians*, 611 F.3d at 714.  As the Court previously explained, "[t]he critical question in this case . . . is whether the LPA has shown that the Met Council has 'irreversibly and irretrievably' committed to a specific SWLRT route."  *LPA II*, 120 F. Supp. 3d at 969 (quoting *Forest Guardians*, 611 F.3d at 714).  "The proper inquiry . . . is therefore not whether an agency has focused on its preferred alternative, but instead whether it has gone too far in doing so, reaching the point where it actually has '[l]imit[ed] the choice of reasonable alternatives.' [40 C.F.R.] § 1506.1(a)(2)."  *Nat'l Audubon Soc'y v. Navy*, 422 F.3d 174, 181 (4th Cir. 2005).

In denying the LPA's first motion for summary judgment, the Court evaluated several earlier cases that applied section 1506.1.  *LPA II*, 120 F. Supp. 3d at 969-72.  In light of those cases, the Court found that several facts were "critical" in this case.  *Id.* at 972.  Those critical facts were (1) the nonbinding nature of the municipal-consent process, (2) the nonbinding nature of the MOUs signed with St. Louis Park and Minneapolis, and (3) that the FTA is not bound by the municipal-consent process. Nevertheless, the Court expressed concern "that a political and bureaucratic drumbeat has

begun that will lead inexorably to exactly the choice the Met Council wants," *id.* at 974, regardless of the environmental review.    Given the Court's previous ruling and the evidence now available, the Court finds that there is no genuine dispute of material fact that the Council has not irreversibly and irretrievably committed itself such that it limited the choice of reasonable alternatives.

First, none of the evidence produced or events occurring since the Court's first summary-judgment order change any of the critical facts that the Court identified and relied on in denying the LPA's first motion for summary judgment.    The municipal-consent process was, and remains, nonbinding.    Indeed, the Council initiated a second round of municipal consent after making changes to the proposed route.    *See Nat'l Audubon Soc'y*, 422 F.3d at 202-06; *Conner v. Burford*, 848 F.2d 1441, 1447-51 (9th Cir. 1988).    The MOUs too remain nonbinding.    Although there is some evidence that Minneapolis (at least now) considers its MOU to be binding, this does not change the Court's view that, for purposes of predetermination, the MOU is non-binding.[7]   *See Forest Guardians*, 611 F.3d at 718-19.    And there is no evidence that suggests that the FTA's ROD – while finding that the FEIS, which evaluated the South Tunnel Plan, complied with NEPA – was legally bound by the municipal-consent process.    *See Burkholder v. Peters*, 58 F. App'x 94, 98-102 (6th Cir. 2003).    All told, these facts show that the Council did not engage in predetermination.    Rather, the Council focused, albeit

---

[7] In fact, it appears that a pact was broken with Minneapolis from several years ago in which Minneapolis was promised that freight rail would be removed from the Corridor.  It is unclear whether it was the Council or Hennepin County that made this promise to Minneapolis.

rather intently, on its preferred alternative, the South Tunnel Plan, which it is permitted to do. *Nat'l Audubon Soc'y*, 422 F.3d at 181.

Second, the evidence shows that the Council did not subordinate all considerations to a particular route such that its decision would constitute predetermination. Rather, the Council acted to secure funding for the SWLRT and to obtain municipal consent – not to predetermine a light-rail route. To be sure, route predetermination would have helped secure funding and obtain municipal consent. But the facts indisputably show that the Council prioritized funding and municipal consent over specific routes or alternatives. When faced with financial pressures and the prospect of not obtaining municipal consent, the Council was willing to change the proposed route to advance their funding and municipal-consent goals. With respect to funding, the Council modified the route, in part, due to budget pressures. And with respect to municipal consent, Minneapolis exerted considerable influence over the Council. Minneapolis, via its MOU, both prevented the Council from foreclosing freight-traffic rerouting and obtained an additional stop at 21st Street – two results that Minneapolis wanted in exchange for its consent. These facts now demonstrate to the Court that the Council did not irreversibly and irretrievably commit to a route such that would eliminate reasonable alternatives. Thus, the Council did not violate 40 C.F.R. § 1506.1. Accordingly, the Court will deny LPA's motion for summary judgment, grant the Council's motion for summary judgment, and enter judgment for the Council.

## CONCLUSION

Ultimately, after careful consideration of the LPA's claims in this case, and a thorough review of the factual record developed by the parties, the Court has determined that the MOUs the Council signed with Minneapolis and St. Louis Park are what the Council says they are:  promises that can be broken.  If the MOUs were binding and they limited environmental review to a single route, the Court would be compelled to find improper predetermination under NEPA.

The Court understands the Council's difficult task.  The state's municipal-consent process enables local governments to attempt to hold light-rail projects hostage if they oppose any part of the project.  And such a scheme can significantly interfere with the goals of a proper regional planning process that appropriately considers the environmental impact of development.  But the factual development in this case demonstrates that the Council did not irreversibly commit itself to a single alternative.  Changes were made, and municipal consent was re-obtained.  Federal law governs procedures, not results, and the Court finds that proper procedures were followed in the approval of the South Tunnel Plan.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that

1.    Plaintiff's Second Motion for Summary Judgment [Docket No. 132] is **DENIED**.

2.     Defendant's Motion for Summary Judgment [Docket No. 138] is

**GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  February 27, 2018                    _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                            JOHN R. TUNHEIM
                                                              Chief Judge
                                                    United States District Court